INTERSTATE Co. *et al. v.* GARNETT.

(Division A. May 13, 1929. Suggestion of Error Overruled, June 10, 1929.)

[122 So. 373. No. 27800.]

328

*Boothe & Pepper* and *Ruff & Johnson,* of Lexington, for appellants.

*May, Sanders & McLaurin,* of Jackson, for appellants.

*Boothe & Pepper,* of Lexington, *Ruff & Johnson,* of Lexington, and *May, Sanders & McLaurin,* of Jackson, for appellants.

*Holmes & Holmes,* of Yazoo City, and *P. P. Lindholm,* of Lexington, for appellee.

Argued orally by *H. H. Johnson* and *J. O. S. Sanders*, for appellant, and by *J. G. Holmes* and *P. P. Lindholm*, for appellees.

Cook, J., delivered the opinion of the court.

The appellee, Lelia Garnett, a minor, brought an action for slander in the circuit court of Holmes county against the Interstate Company, a corporation, and Romeo Faretto, a resident of said county, and recovered a judgment for twenty-five thousand dollars, from which judgment this appeal was prosecuted.

The declaration alleged, in substance, that on or about the 6th day of August, 1928, the defendant corporation, the Interstate Company, was engaged in the business of operating a lunchroom and hotel at Gwin, Holmes county, and that the defendant Romeo Faretto was employed by the said defendant corporation as the manager of its said lunchroom and hotel, and was in charge and control thereof, and was the agent of the said defendant corporation in the operation thereof; that the plaintiff was employed by the defendant corporation as a waitress in its said lunchroom, and as part compensation for her services she received her room in said hotel and board in said lunchroom, and therefore had the right to be in and about said lunchroom and hotel at all times; that the plaintiff performed her services under the direction and supervision of the defendant Faretto, as the agent and manager of said corporation; that the said plaintiff was at that time a minor of the age of eighteen years, and was a young girl of refinement, chastity, and virtue, and was always reputed,

esteemed, and considered by and amongst her neighbors, and by all worthy citizens to whom she was known, as a person of good name, fame, and reputation, pursuing her humble employment as a waitress without charge or suspicion of misconduct against her; that said defendants, well knowing the premises, but willfully, wantonly, and recklessly contriving, and wickedly and maliciously intending, to injure the said plaintiff in her good name, reputation, and employment, and to bring her into public scandal, infamy and disgrace with and amongst her neighbors and other worthy citizens to whom she was known, did, on or about the date named, in said lunchroom and hotel, speaking by and through the defendant Romeo Faretto, who was then and there acting within the scope of his authority and employment as agent of the defendant corporation, and in and about the business of said corporation, and in the performance and discharge of his duties as manager for and on behalf of the corporation, say to, of, and concerning the plaintiff and another, in the presence, hearing and understanding of others, the following: "G—d—you, you G—d— bitches; what the H—l you doing in here? Get out, and that G—d—quick, and don't let me catch you in here any more"—meaning by such language, as then and there spoken, to imply, and falsely implying thereby, that the plaintiff was a girl of unchaste character, loose virtue, and of immoral, lewd, and lascivious practices; that the said term "bitch," so applied to plaintiff, was used at a time and place when and where the term was understood to mean an imputation of lewdness, unchastity, and prostitution; that, in applying the said language to the plaintiff, the defendants acted willfully and wantonly, and out of a spirit of actual malice, and in reckless disregard of the rights, good name, and reputation of the plaintiff, whereby she had been injured in her good name and reputation, and brought into dis-

repute, infamy, and disgrace, and had been caused mental and physical suffering and greatly injured in her employment, and otherwise damaged, to the great damage of the plaintiff, actual and punitive, in the sum of twenty-five thousand dollars.

To the declaration, the defendants filed pleas of the general issue, and gave notice thereunder that they would offer evidence to prove that the defendant Romeo Faretto did not apply to the plaintiff the language charged in the declaration, but, on the contrary, would offer evidence to prove that the said defendant, Romeo Faretto, on discovering the plaintiff and Zelma Jolly, white waitresses in said hotel, while off duty, sitting in the negro compartment of the restaurant or lunchroom, where they had no business to be, near several negro men who were there eating, said to them: "This is pretty G—d—rich; get out of here; you know better than to be sitting in here with these negroes," or practically those words; that the said Romeo Faretto did not use or apply to or toward the plaintiff the word "bitch" or any similar word of like meaning and significance; and that he did not say or do anything that reflected on the character, reputation, or morality of the plaintiff or her companion.

The testimony offered by the plaintiff and the defendants as to the facts and circumstances surrounding the incident or occurrence here involved, and as to the language used by the defendant Romeo Faretto, is sharply conflicting throughout, and, the jury having accepted the testimony on behalf of the plaintiff as the true version, we shall set forth the facts as developed by plaintiff's witnesses, which are as follows:

The appellant the Interstate Company, on the day in question and prior thereto, operated a hotel and lunchroom at Gwin, in Holmes county, which is a junction point on a branch of the Yazoo & Mississippi Valley

Railroad Company, where railroad shops are located and numerous trains pass each day, and this lunchroom is patronized principally by railroad men. The defendant Faretto was the manager and agent in charge of said hotel and lunchroom, having full supervision and control thereof, and having full authority to hire and discharge the employees engaged therein. The plaintiff and her companion, Zelma Jolly, were employed by the appellant corporation as waitresses in this lunchroom. They were young white girls, about eighteen years of age, of good character and reputation. The appellee received as wages twenty-five dollars per month and her room and board in the hotel, and she was required to work from ten o'clock at night until six o'clock in the morning, while her companion, Zelma Jolly worked from six o'clock in the morning to two o'clock in the afternoon. The lunchroom in which the appellee worked had a compartment for both white and colored patrons, these compartments being separated by a partition which lacked a few feet of extending to the ceiling, and there was an entrance to the kitchen from each compartment so as to permit the employees to pass from the kitchen to parts of these compartments which were behind the counters at which the patrons of the lunchroom were served, and the appellee and other waitresses were required to serve both white and negro patrons. The cashier's desk, or stand, was located in the white compartment of the lunchroom near the partition wall, and there was an opening through this partition so that negro patrons could pay the cashier for articles purchased. There was no direct passageway between these compartments, and a person desiring to go from one to the other would have to pass through the kitchen or go out the front door of one compartment and off the gallery in front thereof and back through the front door of the other compartment. This lunchroom was equipped with electric fans and was screened.

On the occasion in question, according to the testimony of the appellee and Zelma Jolly, late in the afternoon, and while they were off duty, they went into the white compartment of the restaurant, where it was cool and comfortable, and seated themselves at the counter, Zelma Jolly at the time being engaged in embroidering, and the defendant Faretto ordered them out of this room, assigning as a reason that they were disturbing the customers. Thereupon they went upon the front gallery and remained a while, but on account of the heat and mosquitoes they went into the negro compartment and sat down on the stools at the counter, there being at that time no negroes therein. A few moments afterwards a negro maid came into the room behind the counter and had some discussion with them in regard to their laundry, and while they were talking to this maid and to Mr. Rose, the cashier, who was in the next room at or near the window, or opening between the compartments, a negro man came in and ordered something to eat and drink, and took a seat on one of the stools several feet away from these girls. The white waitress who was then on duty filled the negro's order, and about that time the appellant Faretto came into the room, and in a very loud, angry, and threatening manner addressed to the two girls then sitting on the stools the language charged in the declaration and hereinbefore stated. The negro man took a hurried departure, while the two girls climbed over the counter and went out into the kitchen. They further testified that Faretto came back into the kitchen where they were and told them that some railroad men had come in, and were talking about their being on the colored side talking to negroes; that they then walked up the railroad, but, on account of the darkness, returned to the hotel; that the appellee returned to her work that night, but notified Faretto that she was going to quit, and on the following afternoon

she did leave her position and go to a neighboring town; and that Miss Jolly worked until her next pay day, and then quit. As to the occurrences in the lunchroom and the language addressed to them by Faretto, these witnesses were corroborated in all respects by the negro maid and by the cashier, Rose.

As bearing upon the issue of punitive damages, the appellee offered in evidence the answers to certain interrogatories propounded to the defendant corporation which showed that it had a paid up capital stock of three million two hundred seventy-eight thousand two hundred dollars and surplus amounting to four hundred seventy-two thousand fifty-seven dollars and thirty-four cents; that its assets on the last general balancing date were six million one hundred sixty-nine thousand one hundred seven dollars and forty cents; that its capital stock included one million five hundred thousand dollars of preferred stock on which quarter yearly dividends of seven per cent. had been paid during the past five years, and that in one year during that period ninety thousand dollars had been paid in dividends on the entire stock, the earnings otherwise over and above the dividends on the preferred stock being reserved in the surplus and devoted to expanding the company's business; and that the company operates hotels, lunchrooms, parcel checkrooms, and news stands in about five hundred different locations, and about forty states throughout the country.

On the conflicting evidence, the court submitted the cause to the jury under instructions which directed them to return a verdict for the appellee, if they believed from a preponderance of the evidence that the language was applied to her as charged in the declaration, and that such language, as then and there used, imported that the appellee was a person of unchaste, immoral, or lewd character, and charged them that in such case the law

implies general damage to the plaintiff without proof of actual damage, and they were further charged that, if they found for the plaintiff and believed from a preponderance of the evidence that the language was so applied to the plaintiff maliciously, or out of a spirit of ill will toward the plaintiff, or in reckless and wanton disregard of the plaintiff, they might also award punitive damages, and in determining the amount of such punitive damages to be awarded they might take into consideration the financial worth of the defendants. The appellants requested and were refused peremptory instructions to find in their favor, and the first assignment of error is based upon the refusal of these instructions.

In passing upon this assignment of error, as well as those based upon alleged errors in instructions granted to the appellee, it will be necessary to first consider and pass upon the question of whether or not words which charge or import unchastity to a female are actionable without proof of special damages, and, while we do not understand counsel for the appellants to contend that such words are not actionable *per se,* we do not know of any case in which this court has expressly decided that question. Under the common law, words imputing a want of chastity, whether the person spoken of be married or single, male or female, are not actionable without allegation and proof of special damages; but, as stated in 36 C. J. 1174, and shown by the expressions of the judges in many decisions, including the early English decisions, this common-law rule has always been in disfavor and has been the subject of severe criticism, and is gradually undergoing a change which has been brought about by statute or by judicial decisions.

In assigning a reason for the existence of this common-law rule, which one great English judge denominated as unsatisfactory and another as barbarous, the courts and textwriters have explained that it was accounted for through the division of authority in Eng-

land between the spiritual and temporal courts. During the Middle Ages, and until such jurisdiction was abolished by statute, the ecclesiastical courts of England had jurisdiction over defamation, which was punished as a sin, but the common-law courts gave no cause of action for defamation unless special damages ensued from such defamation, and such damages were alleged and proven. After the abolishment of the ecclesiastical jurisdiction over defamation, the civil courts still considered themselves bound by the common-law rule that no right of action existed unless special damages were alleged and proved, until the passage of the Slander of Women Act in 1891, Stat. 54 and 55, Vict. chapter 51; but the rule was severely criticized by some of the ablest English judges. In the case of *Lynch* v. *Knight,* 9 H. L. Cas. 577, The Jurist (N. S.) vol. 8, pt. 1, p. 724; decided in 1861, in the judgment of Lord CAMPBELL, which was read by Lord BROUGHAM after the death of Lord CAMPBELL, the following criticism of this rule appears: "I may lament the unsatisfactory state of our law, according to which the imputation by words however gross, on an occasion however public, upon the chastity of a modest matron or a pure virgin, is not actionable without proof that it has actually produced special temporal damage to her; but I am here only to declare the law."

In delivering his own judgment in that case, Lord BROUGHAM said: "I must add that I entirely agree with what my late noble and learned friend says towards the end of his judgment. He laments the unsatisfactory state of our law, according to which the imputation by words however gross, on an occasion however public, upon the chastity of a modest matron or a pure virgin, is not actionable without proof that it has actually produced special temporal damage to her. The only difference of opinion which I have with my noble and learned friend is that instead of the word 'unsatisfactory,' I should substitute the word 'barbarous.' I think that

such a state of things can only be described as a barbarous state of our law in that respect.''

Quotations from many other English judges and law writers expressing the severest condemnation of this common-law rule might be added, but those given above are sufficient to clearly indicate the disfavor which rested upon this rule in the common-law courts of England.

In the courts of this country, this rule has also been severely condemned, and in many jurisdictions it has been abolished by statute, while in others it has been repudiated by judicial decisions. In the case of *Cooper* v. *Seaverns,* 81 Kan. 267, 105 P. 509, 25 L. R. A. (N. S.) 517, 135 Am. St. Rep. 359, the supreme court of Kansas, in a very able and exhaustive opinion, reviewed the English and American authorities on the subject, and, in holding that this common-law rule did not obtain in that state, used very forceful language, which we quote at length, to approve and adopt, the court saying: ''From the foregoing it appears that the rule under consideration resulted solely from the early seizure of jurisdiction over slander by the ecclesiastical courts, which could not award damages at all, and the inability of the temporal courts to strip that jurisdiction from their rivals except in cases involving special damages. It never did rest upon any principle of right or justice or any decent regard for character. It was unsuited to the true genius and real needs of the people over whom it tyrannized, even from the earliest times. It created anomalies in the law of defamation which rendered that law absurd and grotesque. For example, words 'touching' some disreputable good-for-nothing in his work or trade were actionable. The most sensitive, cultivated, high-bred woman could be foully slandered with impunity. Written ridicule of the style of her hat gave ground for exemplary damages. She had no redress for spoken words inflicting one of the deepest wounds her

sex can suffer. The rule was not merely insufferably wrong; it was wrong in a matter of so precious a nature that it was shocking. It was suppressed because it had long been reprobated as odious and was universally detested.''

In the case of *Cooper v. Seaverns, supra,* in discussing whether this rule was in accord with certain provisions of the Bill of Rights as the same appeared in the Constitution of that state, the court further said: ''It is true that constitutional documents of this character are interpreted according to the common law. But in a state where the most profound respect for the character of its womanhood is native to the people imputations of the kind in question cannot be regarded otherwise than as abuses of the right of free speech. Such is the plain fact, and, being abuses, responsibility ought to follow for their utterance. The incurable wound to the victim's feelings, the contempt and disrepute into which she is plunged, her exclusion from the society of the pure and other degrading consequences of the slander are the direct kinds of injuries suffered in reputation. Such, again, is the plain fact, and for such injuries she ought to have remedy by due course of law, which under our procedure is by civil action in the district court. Therefore the common-law rule is at least out of sympathy with the true spirit and purpose of these provisions of the Bill of Rights. The rule had its origin in, and derived its authority from, a dual judicial establishment not only unknown in this country but contrary to the theory and opposed to the organic frame of our institutions. The reason failing, the rule should fail. . . . ''This is not the case of a principle which commands considerable approval, is founded upon fair reason, is merely of questionable wisdom, and which therefore ought to be followed until abrogated by the legislature. It is the case of an outlawed rule of negation whose sole function has always been to thwart natural

justice in one of the dearest and tenderest of human interests. . . . The world is censorious, and a woman's or a maiden's reputation for modesty and chastity is an asset of inestimable value. Its loss renders her poor indeed. Injury in fact is the necessary result of such a deprivation, whether or not the sufferer can point specific damage in a few paltry dollars or to liability to a trifling fine if the charge were true. Therefore the pleading of special damages as a basis for relief ought to be treated as a useless fiction."

This rule has likewise been repudiated by the supreme courts of the states of Ohio, Iowa, Connecticut, and Nebraska. In the case of *Battles* v. *Tyson,* 77 Neb. 563, 110 N. W. 299, 24 L. R. A. (N. S.) 577, 15 Ann. Cas. 1241, the supreme court of Nebraska, in discussing the question of whether or not the common law would be followed in that state, used the following language: "It may be admitted that, if there was nothing else than the number of cases holding to 'the old common-law' rule, and if our action here had nothing else to influence or recommend it, we would be compelled to follow that rule; but as society is now constituted, a female against whom the want of chastity is established is driven beyond the reach of every courtesy and charity of life, and sometimes even beyond the portals of humanity. By common consent such an imputation is now everywhere treated as the deepest insult and the vilest charge that could be given or inflicted upon the victim or her friends. She is denied the society in which she has been wont to move. If in want of employment, her character is gone, and her chance for self-support is injured beyond redress. In our judgment, such a charge is more damaging in its effect than many which are most severely punished by our penal laws."

We can add nothing to the force of the above-quoted language of the courts, and distinguished jurists who have condemned the rule which, in the absence of al-

legation and proof of special damages, denied to a woman a right of action for a charge against her character which, by common consent, is everywhere considered the deepest insult, and the vilest and most damaging charge that can be given or inflicted upon her. Unchastity will not only drive a woman beyond the pale of respectable society, but will practically close to her the doors of every legitimate, gainful occupation or trade, and any rule or doctrine that denies a recovery for a false charge, which is so damaging in its effect, is so unsuited to our system of organized society, so repugnant to the true spirit and purpose of our laws and institutions, and so out of accord with reason and justice, that it will not be adopted or followed in this state, and for authority for so holding we need only cite the very recent case of *Planters' Oil Mill* v. *Yazoo & Mississippi Valley R. Co.* (Miss.), 121 So. 138, decided March 4, 1929, in which the court said: "The supreme court has the authority to declare for itself what the common law of this state is. The common law is the perfection of reason, and, when a rule of the common law ceases to be reasonable and just, it is no longer the common law. Those principles of the common law which are unsuited to our conditions, or repugnant to the spirit of our institutions, are not in force in this state. Only such rules of the common law as are adapted to our institutions and circumstances and not repealed by the legislature or varied by usage are in force. *Green* v. *Weller*, 32 Miss. 650; *Crane* v. *French*, 38 Miss. 503; *Vicksburg & J. R. Co.* v. *Patton*, 31 Miss. 156, 66 Am. Dec. 552." See, also, *Yazoo & M. V. R. Co.* v. *Scott*, 108 Miss. 871, 67 So. 491, L. R. A. 1915E, 239, Ann. Cas. 1917E, 880, and authorities there cited.

Having reached the conclusion that words imputing a want of chastity to a woman are actionable *per se*, there remains to be considered the question of whether

or not the word ''bitch,'' when applied to a woman, does or may impute unchastity, and upon this point the contentions of counsel for the appellants are: (1) That the word ''bitch,'' in its common and ordinary meaning, is not actionable *per se,* and since there was no proof that as used it was understood to impute unchastity, and no proof that there was any such general or local meaning attached to the words, the court below should have granted the peremptory instructions requested by appellants; (2) that, if the peremptory instructions were properly refused, the first instruction granted to the plaintiff was erroneous, for the reason that it assumes, without proof to support it, that there was something more than the mere use of the words which were addressed to the plaintiff to color them and give a force and meaning to them other than the natural and ordinary meaning and import of the words.

The weight of authority in the United States seems to be that the word ''bitch'' of itself, when applied to a woman, is merely a word of opprobrium, and does not import unchastity; but we think this is too narrow a view of the popular meaning and use of the word, and for the court below to have peremptorily instructed the jury that the words complained of, as used, were not slanderous *per se,* would not have been in accord with prior decisions of this court. In the declaration the words were charged with an *innuendo* that the language as then and there spoken implied that the plaintiff was of unchaste character, loose virtue, immoral, and lascivious practices, and was used and so applied to the plaintiff at a time and place when and where the term was understood to mean, and did mean, an imputation of lewdness and unchastity, and, as said by Townshend on Slander and Libel, par. 342, ''Whether the language is capable of bearing the meaning assigned by the *innuendo* is for the court; whether the meaning is truly

assigned to the language is for the jury." In the case of *Stoner* v. *Erisman*, 206 Pa. 600, 56 A. 77, the trial court held that the words "damned bitch" were not actionable *per se*, and in discussing this ruling the supreme court of Pennsylvania said: "In this he fell into error by taking too narrow a view of the popular meaning and use of the term 'bitch.' 'Whether the language is capable of bearing the meaning assigned by the *innuendo* is for the court. Whether the meaning is truly assigned to the language is for the jury.' Townshend on Slander (Ed. 1890), section 342. That the word is sometimes, perhaps frequently, used as a general term of opprobrium, without any definite reference to chastity, may be true; but that it is capable of such reference both in the intention of the speaker and the understanding of the hearers, the lexicographers leave no doubt. The new Oxford Dictionary, the highest single authority in the language, defines 'bitch,' *inter alia,* 'applied opprobriously to a woman; strictly, a lewd or sensual woman;' Webster, 'An opprobrious name for a woman, especially a lewd woman;' Chambers (1898), 'a term of reproach for a lewd woman;' March's Thesaurus, 'a wench or lewd woman.' Other dictionaries, while defining it as a word of opprobrium, omit this special feature of it.. 'The sense in which words are received in the world is the sense which courts of justice ought to ascribe to them. . . . The cases show that the words are to be taken as they are ordinarily understood by the by-standers.' *Bricker* v. *Potts,* 12 Pa. 200. Where words may have a double or doubtful meaning, the plaintiff may by *innuendo* charge which meaning he attributes to them, and it will be for the jury to find whether they were spoken with that meaning or not. Townshend, section 336."

In the case of *Craver* v. *Norton,* 114 Iowa, 46, 86 N. W, 54, 89 Am. St. Rep. 346, there was under consideration the question as to whether the word "bitch," as ap-

plied to a woman, was actionable *per se*, and the court there said: "That such words as were spoken might, by reason of the time, place, and attending circumstances, be taken to impute a want of chastity, seems to be recognized by all the authorities; and it was for the jury to say whether, under the evidence in this case, those hearing understood them to be intended in that sense by the defendant. When persons indulge in language so reprehensible that no occasion can well be conceived of justifying its use, and which, as applied to a human being, has no well-defined meaning, they are not in a situation to complain if it shall be taken in the worst sense possible by hearers. That those listening may have understood defendant as questioning plaintiff's virtue is not to be disputed. Whether they so did was, under the evidence, for the jury, not this court, to decide."

In the case of *Battles* v. *Tyson, supra*, in which the averments of the petition were admitted by demurrer, the court said: "Whether they would bear the construction placed upon them in the petition, and whether those hearing them so understood them, is, we think, a question for the jury, and not for the court. It is true that no *innuendo* can give to plain and unambiguous words a meaning different from that in which they are generally understood; but in this case it does not require any far stretch of the imagination to accept the meaning contended for by the plaintiff in the use of the words defendant admits he used in speaking of her."

To the definitions quoted from the lexicographers in the case of *Stoner* v. *Erisman, supra*, may be added that found in the Standard Dictionary of the English Language, which is: "An abusive epithet, often implying lewdness." An examination of the definitions, as given by these lexicographers, makes it apparent that the term "bitch," when applied to a woman, has two or more distinct meanings, one of which is slanderous *per se*,

and, this being true, the sense in which it was used on the occasion in question was for the determination of the jury, and not the court, and in passing upon that question the jury was entitled, and it was its duty, to consider the various, ordinary, and popular meanings of the word, the connection in which it was used, the object and purpose of the party charged with the use of the language, and all the circumstances surrounding the use thereof. That such is the rule in this state was held in the case of *Rodgers* v. *Kline,* 56 Miss. 808, 31 Am. Rep. 389, which was an action for libel in which the alleged libel consisted of the use of the word ''malpractice,'' and where, after reaching the conclusion that there was nothing in the context to warrant the conclusion that the word was used in its technical sense rather than its ordinary and popular signification, the court said:

''The force of the alleged libel seems to consist in the use of the word 'malpractice.' In its technical sense, as applied to prosecutions, either civil or criminal, against a physician for unskilful treatment of a patient under his charge, it would be actionable. But there is nothing in the article of which this language is a part, which suggests that the word was used in a technical, rather than a popular, sense. On the contrary, it is clear, from a consideration of the whole article and its nature and character, that it was not used in its technical sense.

. . .

''It was, therefore, error for the court to give this charge, unless the word 'malpractice,' in its ordinary signification, has but one meaning, and that meaning is libellous; or unless a libellous signification is necessarily affixed to it by the context. We have seen that there was nothing in the context, nothing in the scope and purpose of the article, to give it a libellous meaning; but rather, if the context is to be considered as fixing beyond controversy its meaning, the contrary sense would

be implied. Neither has the word 'malpractice,' in its ordinary acceptation, necessarily a libellous meaning. It has several meanings: One of them, implying illegal or immoral conduct, is libellous; and the others—bad or evil practice, practice which is not good, practice which is contrary to established rules—are not libellous.

"When the language used is ambiguous, or a word has two distinct meanings, the sense in which it is used in the alleged libel must be determined by the jury, and not by the court. In performing this duty, the jury are to consider all the circumstances of the case; the various ordinary and popular meanings of the word; the connection in which it is used; and also the object and purpose of the author in the writing in which it is found, so far as that object and purpose may be developed to the reader by a perusal of the whole article."

Applying the principles announced in *Rodgers* v. *Kline, supra,* we are of the opinion that they lead to the conclusion that there was no error in refusing the requested instructions peremptorily charging the jury that the words did not import unchastity, and were not actionable *per se.* And this disposes of all the assignments of error based upon the refusal of instructions requested by the appellants, except the assignment based upon the refusal of an instruction numbered 10 requested by them. By this instruction the appellants sought to have the court instruct the jury that, if they found from the evidence that the language complained of was used and addressed to the plaintiff on the occasion in question, still they must find for the defendants unless they believed that by such language the defendant Faretto intended to imply, and did imply, that the appellant was a person of unchaste character, loose virtue, and immoral, lewd, and lascivious practices. This instruction was properly refused for the reason that it made the liability of the appellants depend not only upon what the words were understood to, and did, imply,

but also upon what the defendant Faretto intended thereby to imply. While the intent with which the language was used was material as bearing upon the question of punitive damages and in the jury's consideration of the right to recover such damages, the appellants were not relieved of liability by reason of the fact that the defendant Faretto may not have intended to injure the plaintiff or to imply a want of chastity.

In 36 C. J., 1214, this rule is announced in the following language: "The publication of defamatory matter actionable *per* se entitles the party defamed to compensation for the actual injury done him without regard to the motive with which the publication was made; want of actual intent to injure furnishes no legal excuse."

In *Jones* v. *Edwards,* 57 Miss. 28, this court said: "The law implies damage from the fact of slander; and it is error to charge that it is for the jury to say from the whole testimony whether the plaintiff's character was injured."

Again in the case of *Rodgers* v. *Kline, supra,* it was held that: "But the absence of this intent or purpose does not, *per se,* exonerate the publishers of the article from responsibility, if, in fact, such language was used in it as would inflict an illegal injury on the plaintiff; for the injury to him would be all the same whether it was the result of design on the part of the defendants, or of their carelessness and negligence."

The appellants also contend that instruction No. 1 granted to the plaintiff, which authorized a verdict for the plaintiff, if the jury found from the evidence that the language complained of was used, and that, as then and there used, it imported that the plaintiff was a person of unchaste, immoral, or lewd character, was erroneous, for the reason that there was no evidence as to the meaning of the alleged slanderous word, and no proof that it was intended to mean, and understood to

mean, that the defendant Faretto was imputing unchastity to the plaintiff. In the case of *Rodgers* v. *Kline, supra,* it was held that it is not permissible to show the various, ordinary, and popular meanings of a word by the introduction of evidence before the jury, the court saying:

"It is also assigned for error, that the court permitted Dr. Whitehead to state to the jury the ordinary and popular, as also the technical, meaning of the word 'malpractice.' This witness, in the first part of his examination, stated to the jury the several popular and ordinary meaning of the word. The introduction of this evidence was irregular practice; but, as the definitions given by the witness were correct, we cannot see that the defendants were injured, and we would not, therefore, reverse for that cause alone. The court is supposed to know the popular and ordinary meaning of all English words. In case the court doubted as to the meaning of a particular word, it would be proper for the judge to refer to a standard dictionary and inform himself. In cases in which the court is authorized to construe the words, the judge is authorized, in his charge to the jury, to expound their true meanings. And in cases like this, where a word is ambiguous, and the jury are entitled to decide in which of its several meanings it is used, it would be proper for the court to state, in the charge to the jury, these meanings, and leave it to them to adopt that in which, in their judgment, it was used by the defendant. The meaning of an English word, not a technical term and used as such, is not to be made known to the jury by an examination of witnesses before them."

In the case at bar, the connection in which the language complained of was used, and all the facts and circumstances concerning its use, were in evidence, and the sense in which the alleged slanderous words were used on the occasion in question was a question for the

determination of the jury under all the facts and circumstances surrounding the occasion and use of such language.

The appellants also complained of the refusal of the court below to require the plaintiff to file a bill of particulars specifying the exact date and hour when, and the exact place in the restaurant where, the words were spoken, and also the names and places of residence of all persons present and within hearing at the time the alleged words were spoken. We think the declaration was sufficiently definite in these respects, and that appellants were not prejudiced by the refusal of the court to require this bill of particulars, and this is made manifest by the fact that on the day the motion for the bill of particulars was filed, and three days before it was heard and acted upon by the court, the defendants filed notice under the plea of the general issue, denying that the language charged had been used by the defendant Faretto, and setting forth in detail the language alleged by the appellants to have been used on the occasion in question by Faretto, and the time and place when it was used, and the persons present. From an inspection of the pleas and notice which were on file at the time the bill of particulars was requested, we think appellants were sufficiently advised as to the time, place, and circumstances of the charge laid in the declaration.

Over the objection of the appellant the Interstate Company, E. K. Rose, a witness for the plaintiff, was permitted to testify that, after the filing of this suit, he had a conversation with the appellant Faretto, in which Faretto endeavored to hire him to make an affidavit that he did not hear him say anything to the plaintiff and her companion, and the appellants assign as error the refusal of the court to exclude this testimony. We think the court below properly overruled the motion to exclude this testimony for two reasons. In the first place,

there was no objection on the part of the appellant Faretto to this testimony, and it was clearly admissible in evidence as against him. In 22 C. J. 321, the rule for the admission of this class of testimony is stated in the following language: "An attempt to suborn perjury is evidence that the cause of the party by whom such an attempt was made, or to whom it is attributable, is unjust, or at least weak, and the same is true of an attempt to persuade witnesses not to attend a trial or not to testify. So also the suppression or destruction of documents is in the nature of an admission that they are unfavorable to the party having control of them, and a similar result may attach to an attempt to prevent investigation. Accordingly such matters may be shown as being in the nature of admissions, although they are not of course conclusive."

Since this testimony is in the nature of an admission made by the appellant Faretto, it was clearly admissible as to him, and the court properly overruled the motion of his codefendant the Interstate Company to exclude it, and, since at the conclusion of the evidence the court was not requested to instruct the jury that this testimony should not be considered as against the Interstate Company, it cannot now complain of the admission thereof. However, we think it was admissible as against both defendants, since they were jointly liable in the action, if liable at all, and this testimony was in the nature of an admission made by one codefendant about a matter within the common purpose and relating to the joint interest in the matter out of which liability was alleged to have arisen. This rule is stated in 22 C. J. 352, in the following language: "Where two or more codefendants, if liable at all, are liable jointly, an admission of one is competent against the other, provided it was made within the scope of the common purpose and relates to the joint interest in the matter out of which the liability is claimed to arise."

The appellants contend that the trial court permitted counsel for the appellee to use improper language in the closing argument to the jury. The special bill of exceptions setting forth the alleged objectionable remarks of counsel affirmatively shows that ''no objection was made to such words and statements by the defendants or their attorneys during said argument, and not until after verdict of the jury and judgment entered thereon.'' The record discloses that the trial of the case was concluded on October 23d, while the bill of exceptions was not filed and presented to the trial judge until November 1st thereafter. In the case of *Pullman Palace Car Co.* v. *Lawrence,* 74 Miss. 782, 22 So. 53, it was held that it is the duty of the court to interpose, if improper remarks are made by counsel, ''but if the court fails to do so, it is the duty of opposing counsel to call the attention of the court to such impropriety, and thus have the proper corrective then and there applied. If counsel fail to thus give the trial court an opportunity to undo any wrong that may have been committed, we will not correct here, except as stated, in cases of extreme and intolerable abuse of the advocate's privilege.'' There was here no such intolerable abuse of the advocate's privilege as would require or justify a reversal of the cause on account of the failure of the court to interpose, in the absence of any request so to do from opposing counsel or any objection to the alleged improper remarks by counsel.

Under the facts and circumstances shown by the proof in this record, we are of the opinion that it was proper to grant an instruction authorizing the jury to assess punitive damages, if they believed the defendant Romeo Faretto spoke the language maliciously, or out of a spirit of ill will toward the plaintiff, or in reckless or wanton disregard of the plaintiff, and, as bearing upon the question of the proper award of punitive damages, the evi-

dence as to the financial worth of the defendants was properly admitted. *Pullman Palace Car Co.* v. *Lawrence, supra.*

Finally, the appellant contends that instruction No. 1 granted to the plaintiff is erroneous, because it authorized the jury to return a verdict in appellee's favor for twenty-five thousand dollars, the sum sued for, which sum was grossly in excess of what she was entitled to in any view of the case. In the case of *Alabama & Vicksburg R. Co.* v. *Dennis,* 128 Miss. 298, 91 So. 4, and *Gulfport & Mississippi Coast Traction Co.* v. *Keebler,* 130 Miss. 631, 94 So. 795, it was held that in an action for damages an instruction to the jury that, in the event they believed certain facts therein set forth, they should return a verdict for the plaintiff for a sum not in excess of the amount sued for, was erroneous, if the limitation thus placed on the verdict grossly exceeded the amount for which a verdict would be warranted by the evidence, and that such an instruction was prejudicial, if the verdict returned in pursuance thereof was excessive.

After a careful consideration of the record in the case at bar, we are of the opinion that the amount of damages assessed is grossly excessive, and may have been induced by the instruction which charged the jury that they might return a verdict for the plaintiff, if they believed certain matters therein set forth to be true, for twenty-five thousand dollars, the amount sued for. If the appellee will enter a *remittitur* of ten thousand dollars, the judgment of the court will be affirmed for fifteen thousand dollars; otherwise, it will be reversed, in so far as it fixed the amount to be recovered, and the cause remanded for trial on the question of damages only.

*Affirmed, with remittitur.*

## On Suggestion of Error.

McGowen, J. After a careful consideration of the suggestion of error herein, we are of the opinion that we should overrule it and allow the opinion as written to stand as the view of this court without change or modification.

Though counsel did not argue the point either orally or in their briefs, out of deference to their insistence and earnestness, and in order that our position relative thereto may be clearly stated, we shall briefly consider the third point, suggested as error, which is:

"Third. We respectfully suggest that it was error for the court to conclude that the admission of proof of the wealth of the Interstate Company, one of the defendants, and the giving of the following instruction for the plaintiff: 'The court instructs the jury for the plaintiff that if they should find from the preponderance of the evidence that the plaintiff is entitled to recover punitive damages, then the jury in determining the amount of such punitive damages to be awarded may take into consideration evidence of the financial worth of defendants and each of them'—was not error prejudicial to the defendants and were therefore in error in justifying the award of large punitive damages predicated of such proof."

It is now pressed on this court to adopt the rule as announced by many appellate courts of this country, which is as follows:

"In an action against two or more defendants the pecuniary ability of one should not be considered by the jury in determining the damages to be assessed jointly. Thus in an action against a corporation and one of its employees for damages for injuries sustained through the alleged negligence of the latter it is error to receive the evidence of the wealth of the corporation for the purpose of enhancing the damages to be assessed against

both defendants. 12 Am. & Eng. Ency. of Law (2 Ed.), pp. 47, 48."

And there is cited as sustaining this view: Sutherland on Damages, section 405 (4th Ed.); *Washington Gaslight Co.* v. *Lansden*, 172 U. S. 534-553, 19 S. Ct. 296, 43 L. Ed. 543; *Smith et al.* v. *Wunderlich et al.,* 70 Ill. 426; *Toledo, W. & W. Ry. Co.* v. *Smith,* 57 Ill. 517; *Chicago City Ry. Co.* v. *Henry,* 62 Ill. 142; *Singer Mfg. Co.* v. *Bryant,* 105 Va. 403, 54 S. E. 320; *Schafer* v. *Ostmann,* 148 Mo. App. 644, 129 S. W. 63; *Leavell* v. *Leavell,* 114 Mo. App. 24, 89 S. W. 55; *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 130 A. 758.

These cases sustain the contention of counsel as to the rule adopted in those jurisdictions; but for more than sixty-five years the position of our own court on this question has been in opposition to the view contended for by counsel, *supra,* and our court's position has stood unchallenged; and we are now governed by this ancient rule, unless we should overrule it and adopt a different and contrary one. The rule controlling here is announced in the case of *Bell* v. *Morrison,* 27 Miss. 68, by Judge HANDY, in which the precise question was settled in a case where the plaintiff sued several defendants for damages for assault and battery, and on the trial evidence was admitted showing the quantity of property owned by Tyrus Bell, one of the defendants. It was there contended that the wealth of this defendant furnished no proper criterion for assessing damages caused by the injury to the plaintiff, and evidence upon that point was improperly admitted as to the other defendants who were affected by the damages assessed. What the court there said is:

"This evidence could have been introduced for no other purpose than to justify the jury in increasing the damages that might be awarded to the plaintiff. The plaintiffs in error insist that the wealth of the defend-

ant furnished no proper criterion for assessing the damages caused by the injury to the plaintiff; and further, that evidence upon that point was improperly admitted, as to the other defendants who were affected by the damages assessed.

"It is settled by authorities almost without exception, in England and in the United States, that in actions for injuries to the person or to the character, the jury are not restricted, in giving damages, to the actual, positive injury sustained by the plaintiff, but may give damages as a punishment against the defendant; that not only may the plaintiff receive compensation for the injury inflicted upon him, but that the interest of society may be regarded, and such damages may be awarded as will tend to operate by way of example, and to deter others from similar acts of violence and oppression. See Sedgwick on Damages, 39 *et seq.*, and cases there cited.

"If this rule, which is sanctioned by so many high authorities, be just and salutary, it can only be properly and effectively applied by taking into consideration all the circumstances, whether of aggravation or mitigation of the grievance complained of, the situation of the parties as to wealth, character, and influence, and awarding such damages, in view of all these circumstances, as will both render reparation to the plaintiff, and act as an adequate punishment to the defendant. The damages which would operate as a proper punishment to one man might be inadequate to that effect upon another, by reason of their difference in pecuniary condition; and on the contrary, a verdict that would be scarcely regarded by a wealthy man, might be ruinous to a poor man. Hence the necessity, if the principle of exemplary damages be sound, to inquire into the pecuniary condition and circumstances of the defendant, in order, if the jury consider the case worthy of being made an example of, that the verdict may at once be adequate to the injury

done to the plaintiff and to society, and just and reasonable to the defendant.

"The action was for the joint tort of the defendants, who joined in their pleas. In such a case, it is held to be proper for the jury to assess damages against all the defendants jointly, according to the amount which, in their judgment, the most culpable of them ought to pay. 2 Greenl. Evid., section 277. Whatever, therefore, would be competent evidence with that view as to one, would be competent as to all of the defendants. Otherwise a wealthy defendant, who was principally implicated in a wrong of this character, might escape the payment of just and reasonable damages, by having others, without character or property, associated in the unlawful act. We therefore think that this evidence was properly submitted to the jury."

In *Storm* v. *Green,* 51 Miss. 103, the rule announced in *Bell* v. *Morrison, supra,* was approved by the court, Judge SIMRALL speaking for the court in the former case.

We are bound by these decisions, and now hold that in a case where exemplary damages are properly allowable by a jury, that evidence which is competent against one of several defendants is competent against all, and that the wealth, character, and influence of a defendant implicated in a wrong of this kind may be shown by competent evidence, and what may be shown as to one defendant is competent as to all.

The suggestion of error is overruled.

*Overruled.*