PETRA RAFAELA GONZÁLEZ, Plaintiff and Appellee, *v.* ARCADIO RAMÍREZ CUERDA, Defendant and Appellant.

No. 589.     Decided April 23, 1963.

*Mario Báez García* for appellant. *E. Ramírez Vincenty* for appellee.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The extensive record of this case reveals tragically and in crimson red the manner in which certain human beings twist their life and become involved in the rough encounters and trying times of life, to the extent of putting at stake the inbred sense of decency and respect for human dignity which characterizes our society.

Notwithstanding the bulk of the contradictory testimonies that appear from the record of this case, no reason has been pointed out to us that would warrant our disturbing or in no way modify the findings of fact of the trial court. On

the contrary, we have carefully examined said record and have found that such findings are supported by the evidence brought before the judge who was in a better position than this Court to settle the conflict in the evidence that arose at the hearing of the case, and gauge the credibility of the witnesses who testified before him. Thus, we dispose of the first error assigned by appellant Arcadio Ramírez Cuerda.

The findings of fact are as follows:

"1. By the end of the year 1958 plaintiff Petra Rafaela González appeared at the office of the prosecuting attorney of the Superior Court, Mayagüez Part, and filed a complaint against Arcadio Ramírez Cuerda, defendant in this case. As a result Mr. Luis A. Limeres issued a summons on October 7 of that same year ordering the accused to appear at his office. (Exh. 2, defendant.)

"2. In the presence of respondent, the aforementioned officer made plaintiff repeat the alleged statements made by Ramírez Cuerda, which were injurious to the professional honesty of Mr. Limeres.

"3. Mr. Limeres then asked defendant for an explanation of his conduct, and he answered, we quote: 'Because you give credit to a whore, a perverted woman like Mrs. González, who has sexual relations with her boarders.' Prior to that day the prosecuting attorney had not met plaintiff, although defendant had requested him to order Petra Rafaela González to vacate a house belonging to him.

"4. Defendant made similar statements to Rafael Quevedo, referring to plaintiff, in a conversation they both had in December 1958.

"5. As antecedent to the events stated, plaintiff and defendant met at the end of 1957, and by June 1958 she occupied a house belonging to defendant for a monthly rental of $100, and she established her business, a boarding house and meal catering service.

"6. Plaintiff and defendant had a love affair for some time in the year 1958, and during that time defendant lent her money, guaranteed her loans in the bank, which particulars were established by documentary evidence consisting of a diary;

grocery lists, notices from the bank, and a letter addressed to defendant by plaintiff.

"7. By October 1958 the love affair ceased and plaintiff moved her business to another house.

"8. In that same year plaintiff and the student Tony Vélez had marital relations, which union culminated in the birth of a child in December 1959.

"9. While virgin and in her youth, plaintiff had lived as husband and wife with Lolo Vargas, who was a married man, although separated from his wife.

"10. The above-stated events tend to show that plaintiff had lived maritally with three men at different times in her life, without being married to them. A hardworking woman and interested in the welfare and future of her daughter, fruit of her love affair with Antonio Vélez, of poor education and of reproachable conduct, without going to the extremes contained in the slanderous statements of the defendant.

"11. Considering the first part of the preceding paragraph, the court believes that the damages proved and caused to plaintiff should be reduced to the sum of $1,000."

To review the judgment ordering appellant to pay appellee the sum of $1,000, costs, and $500 for attorney's fees on the ground that appellant slandered appellee upon uttering the injurious phrases in relation to her chastity which were pointed out in the findings of fact, and that such phrases constitute slander per se because they charge the commission of an offense, appellant has filed the present petition and points out that the trial court committed error in applying the law to the present case, in deciding that the word "whore" charges a crime, and in failing to pass upon a motion of dismissal which was based on the fact that no imputation of an offense was alleged and that the imputation did not cause any special damages. Because these two errors are closely interrelated, we shall discuss them jointly.

In *Moraza* v. *Rexach Sporting Corp.*, 68 P.R.R. 433 (1948), we said that the imputation of "thief" uttered in an outburst of excitement and passion does not constitute

slander per se. The record does not show that the imputations which gave rise to the cause of action in this case have been uttered in such a state of mind. Furthermore, in uttering one of the imputations that gave rise to this action, other details were pointed out as a means of explanation or ground to the same.

The Act that establishes the action of damages for libel and slander, defines the latter as follows:

"Slander is a false and unprivileged publication other than libel, which imputes to any person the commission of a crime, or tends directly to injure him in respect to his office, profession, trade or business, or which by natural consequences causes actual damages." (32 L.P.R.A. § 3143.)

■■ In the case of slander as well as in libel, the right of action accrues per se, that is, special damages need not be alleged or proved to impute a fact (1) constituting a crime, or (2) which tends directly to injure a person in respect to his office, profession, trade or business. But, contrary to what the statute provides with regard to libel, in the case of slander the statute makes no special reference to publications that tend to expose a person to the hatred of the people or its contempt, or to deprive him of the benefit of public confidence and social intercourse. That is, the statutory definition of slander does not include or extend itself expressly to cases of slanderous imputations about the honor of a woman, in the absence of allegation and evidence of specific damages.

As appellant indicates, the phrases uttered by him do not impute the commission of a crime in Puerto Rico, for neither the fact of being a prostitute nor fornication constitute a crime in this jurisdiction unless one party be married, in which case the facts may constitute the crime of adultery.

The imputation might tend directly to injure a person in the conduct of his trade or business, if generally, they are spoken in relation to or concerning the way of such trade,

that is, it must have the purpose and the effect of questioning the credit and honesty or integrity of the person in the conduct of his business. (Newell, Slander & Libel, §§ 150, 154.) Although maybe it could be maintained here that the epithet about the honesty of the appellee in her private life affects the way of her trade because it is related to the nature of her boarding business and the catering of meals, we prefer to maintain the cause of action filed on the grounds we shall set forth hereinafter.

Under the common law which is the source of our statute on libel and slander, the slanderous phrases in respect to the want of chastity in a woman were not actionable per se. The original reason for this rule was that the same did not constitute the imputation of an offense punishable by the temporal courts and, on the contrary, they constituted an offense of which only the spiritual courts could take cognizance. This rule has been modified in different jurisdictions either by statute or by judicial interpretation, its ground being considered anachronous. *Crellin* v. *Thomas*, 247 P.2d 264 (Utah 1952); *Good* v. *Johnson*, 83 N.E.2d 367 (Ill. 1949); *Biggerstaff* v. *Zimmerman*, 114 P.2d 1098 (Colo. 1941); *Shultz* v. *Shultz*, 275 N.W. 562 (Iowa 1937); *Lukosevicia* v. *Barton*, 122 Atl. 709 (Conn. 1923); *Walmsley* v. *Kopczynski*, 195 N.Y.S. 699 (1922); *Mercy* v. *Talbot*, 189 Ill. App. 1 (1914).

In Puerto Rico, where the concept of human dignity is so deeply rooted, an eloquent example of which is contained in the Bill of Rights of our Constitution, and in which we sanction, as an inalienable part of our assets of human values, the greatest respect to the woman, progenitor of our life, mother of our children, and the cornerstone of our family, we have not, strange as it may seem, legislated specifically, as has been done in so many other jurisdictions, to make actionable per se the slanderous imputation in relation to the chastity of women.

■ We believe, notwithstanding the state of the statutory law previously pointed out, that in Puerto Rico the false imputation to the honor of a woman is actionable per se. We shall state below the grounds which, in our judgment, support this criterion.

The action of damages for the publication of false events in relation to the honor of a woman may fall within the terms of §§ 7 and 1802 of the Civil Code now in force (31 L.P.R.A. §§ 7 and 5141). It has been so held by the Supreme Court of Spain referring to the equivalent sections of the Spanish Civil Code, §§ 6 and 1902, in its judgment of December 6, 1912 (125 *Jur. Civ.* 582). This case dealt with the publication in a newspaper of the false news about a friar who had eloped from a convent with a girl specifically named, from whom he had had scandalous succession three months before. The newspaper afterwards published a complete and indubitable retraction. Said Court decided in that case:

"Whereas the honor, honesty, and reputation of a woman constitute the social assets of her greatest esteem, and its impairment the loss of greatest consideration that she could suffer in a civilized society, disabling her to exhibit the reputation of depositary and custodian of the sacred goals of the home, basis and cornerstone of public society, causing these damages hence, to be considered as among the most serious ones which compel the legislator to bear them in mind when legislating, as well as the courts charged by law to apply and do justice for the purpose of compensating them, and fix a standard rule, establishing civil responsibility in harmony with the legal principles which underlie our common law, for otherwise it would promote in society a suicidal negligence, such as is the abandonment of a first-class social element, like the woman, to the whim of public defamation.

"Whereas, taking into consideration these social principles of every legislation and every organization of justice, it cannot be ignored that the controverted fact in record constitutes a total and absolute spoliation of personal, familiar and social dignity of the offended lady, violently dispossessed of all her

titles of modesty and honesty that made her worthy of the public esteem, by presenting her publicly and shamefully as guilty of eloping from her own home and as having indulged in sacrilegious concubinage, with all the natural consequences, disqualifying by reason of public exposition of the slanderous deed in newspapers of general circulation, like *El Liberal,* which make the rectification impossible, because of the indelible impression caused in the mind of its readers, as well as because the reproduction of all injurious articles in the newspaper does not affect, according to reiterated jurisprudence, the responsibility of the one who produces it, since what the law punishes is the propagation of the insult; and for all such reasons the trial court, in considering the moral damage in terms of pecuniary compensation, does not mistake, as it is assumed, the attributions of the Judicial Power with those of the Legislative Power . . . a pecuniary compensation, which, although it is never sufficient to repair the wrong done, in the end it comes nearest to the evaluation of the moral damages directly caused to Miss Mussó, and which entail, as natural and logic corollary, other damages, that is, material and social, according to the criterion so wisely stated in *Las Siete Partidas,* Law XXI, Tit. IX, which provides 'that any person who is subjected to wrong or dishonor, may demand reparation therefor in either of the two following ways, whichever he chooses. First, the party who caused him the dishonor can make reparation by the payment of money. The second is by way of accusation; the injured party requesting that he who committed the wrong against him shall be punished for it . . . . Either one of these ways is disposed of by the selection of the other, because a man cannot be subjected to two distinct penalties for one offense. After the complainant has chosen one of them he cannot abandon it and ask for the other . . . .' which law has been traditionally applicable in Spain.''∎

The court upheld the determination of the amount of the damages, notwithstanding that no evidence of special damages was presented, in these terms:

". . . the value of such damages does not always rest upon the evidence to be introduced in the suit, but rather on the prudent consideration given to the claim made in the essential allegations of the discussion, and not only for this, but because it being unquestionable that the honor and personal decorum are above human trade, and that only the one who loses them can appreciate them in all their worth, it is only incumbent on the trial court, due to the nature of the suit, to fix the amount, considering the circumstances of the aggrieved party, her age, and her social position, which appreciation is not contrary to the manner provided by the traditional law for paying compensation thus: 'the judge should then ask the complainant for what amount he would not have been willing to have suffered the said dishonor; and, after he has estimated it, the judge must take into consideration the act causing the dishonor, the place in which it was performed and the station of the party upon whom it was inflicted, as well as that of the one who caused it. After having carefully investigated all these matters, if he thinks that the party made a just estimate, he must order him to swear that he would not have been willing to receive the dishonor for the sum so estimated by him, and after he was sworn to this the judge shall render his decision . . . .' "

■ Not only is the action for damages for false imputations to the honor of a woman appropriate, but also the evaluation of the damages under such circumstances corresponds to the judge according to the demands of equity, for which reason the want of pecuniary determination cannot be sufficient cause for the denial of the compensation. This doctrine has been subsequently reaffirmed by said court in its judgments of November 7, 1919 (148 *Jur. Civ.* 36, 2d Series) ; May 19, 1934 (III Aranzadi, *Repertorio de Jurisprudencia* 449, No. 903) ; February 2, 1940 (VII Aranzadi, *Repertorio de Jurisprudencia* 59, No. 89) ; December 24, 1941 (IX Aranzadi, *Repertorio de Jurisprudencia* 72, No. 115) ; December 2, 1946 (16 *Jur. Civ.* 586, 2d Series) ; and May 24, 1947 (18 *Jur. Civ.* 1196, 2d Series) ; 12 Manresa, *Comentarios*

*al Código Civil Español* 652; II-2 Puig Brutau, *Fundamentos de Derecho Civil* 675.

The statutory definition of slander adopted in Puerto Rico made no express provision as to false imputations with respect to the honor of a woman. Therefore, we understand that it is not incompatible with the aforesaid doctrine, which has been established under statutory provisions similar to ours.

■ Furthermore, in addition to the old statute which specifically provides for the action based on slander, but which is silent with respect to the slanderous imputation about the chastity of a woman, the Constitution of the Commonwealth of Puerto Rico confers to every person the right to protection of law against abusive attacks on his honor, Art. II, § 8, Constitution of Puerto Rico (L.P.R.A., Vol. 1, p. 180). The slanderous imputation of want of chastity in a woman is the most abusive attack that can be done to her honor. It is known that when, in a Constitution, a general norm is established, legislation is not necessary to implement it. Therefore, it is obvious that the imputation in this case is actionable, and that as we have previously shown is actionable per se.

The preceding conclusion is further buttressed by findings of courts of last instance in jurisdictions where the right stems from the Anglo-Saxon common law, and where the archaic rule of said right denying any relief in cases like this has not been followed.

In *Cooper* v. *Seaverns*, 105 Pac. 509 (Kan. 1909), it was held that it was slanderous per se to say that "that little girl was born within four or five months after they were married. Now, what do you think of them?" In this case, that has been followed subsequently and that has set up the rule in Kansas and in other jurisdictions (*Interstate* v. *Garnett*, 122 So. 373 (Miss. 1929)), the Supreme Court of said state made a detailed analysis of the case law on the subject

and, in deciding not to follow the doctrine of the common law declaring that an imputation like that is not actionable, it decided:

"The Legislature has not expressed itself on the subject of the common-law doctrine under consideration. The Constitution, however, contains the following provisions: 'The liberty of the press shall be inviolate; and all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such right. All persons for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay.' Bill of Rights, §§ 11, 18 (Gen. St. 1901, §§ 93, 100). It is true that constitutional documents of this character are interpreted according to the common law. But in a state where the most profound respect for the character of its womanhood is native to the people imputations of the kind in question cannot be regarded otherwise than as abuses of the right of free speech. Such is the plain fact, and, being abuses, responsibility ought to follow for their utterance. The incurable wound to the victim's feelings, the contempt and disrepute into which she is plunged, her exclusion from the society of the pure, and other degrading consequences of the slander are the direst kinds of injuries suffered in reputation. Such, again, is the plain fact and for such injuries she ought to have remedy by due course of law; which under our procedure is by civil action in the district court. Therefore the common-law rule is at least out of sympathy with the true spirit and purpose of these provisions of the Bill of Rights . . . .

"This is not the case of a principle commanding considerable approval, founded upon fair reason, merely of questionable wisdom, and which, therefore, ought to be followed until abrogated by the Legislature. It is the case of an outlawed rule of negation whose sole function has always been to thwart natural justice in one of the dearest and tenderest of human interests. Therefore its rejection is justified. . . . The world is censorious, and a woman's or a maiden's reputation for modesty and chastity is an asset of inestimable value. Its loss renders her poor indeed. Injury, in fact, is the necessary result of such a deprivation whether or not the sufferer can point to specific damage in a few paltry dollars, or to liability to a trifling fine

if the charge were true. Therefore, the pleading of special damages as a basis for relief ought to be treated as a useless fiction . . . . Taking into consideration the origin and history of the rule, the reason supporting it, its character, its consequences, and the degree of its appositeness to our Constitution and system of laws, it does not apply to the conditions or meet the needs of the people of this state, and consequently it is not a part of the law of this state."

What less can we say in this community where, deep in our heart, we feel the same noble sentiments with respect to the woman; where the Bill of Rights of our Constitution not only provides guarantees similar to those cited by the court in the preceding case, but also, more specifically, provides that: *"Every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life."* (Italics ours.)

In view of the foregoing we decide that, in the light of the state of our law and for the purpose of giving life and effect to the guarantees of the invaluable human values consecrated in the Constitution of Puerto Rico, the false imputation of want of chastity in a woman, calling her a prostitute when she is not, constitute a slanderous statement per se and, therefore, in a case like the one at bar, neither the allegation nor the evidence of special damages is required.[1]

The judgment appealed from will be affirmed.

Mr. Justice Santana Becerra and Mr. Justice Pérez Pimentel concur in the result.

Mr. Chief Justice Negrón Fernández did not participate herein.

---

[1] In 49 A.B.A.J. 149, No. 2, of February 1963, an interesting annotation entitled *"Remolding of Common Law Defamation"* by Professor Albert E. Harum is published, in which it is maintained that libel is actionable without proof that actual damage has occurred, this not being the case with slander, which is actionable only in specific cases. Such was the ancient common-law rule with respect to libel, and such is the law in England and in a minority of the North American jurisdictions, and it has been adopted by "Restatement, Torts". Nevertheless, the same is

not followed in the majority of the North American jurisdictions, nor in Puerto Rico, where the allegation and proof of specific damages are required, when it refers to libel per quod. *Bosch* v. *El Imparcial, Inc.,* 87 P.R.R. 269 (1963).