353 So.2d 1315 (1977)
STATE of Louisiana
v.
Frederick FRANKLIN, Jr.
No. 60182.
Supreme Court of Louisiana.
December 19, 1977.
Rehearing Denied January 27, 1978.
*1316 Robert Glass, Martzell & Montero, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William L. Brockman, Asst. Dist. Atty., for plaintiff-appellee.
DENNIS, Justice.
Defendant, Frederick Franklin, Jr., was convicted by a jury of possession of heroin with intent to distribute, a violation of La. R.S. 40:966A(1). He was sentenced to life imprisonment at hard labor. La.R.S. 40:966B(1). On appeal, he relies upon two assignments of error.

ASSIGNMENT OF ERROR NO. 1
In July and August of 1976 two New Orleans police officers received information from a reliable confidential informant, whose information in the past led to arrests and convictions, that defendant was engaged in the wholesale distribution of heroin from several addresses, one of which was the Lawrence Creek Apartments, Court 6, Apartment 112. The informant said that defendant drove a '73 or '74 black Thunderbird. From July 1976 through September 9, 1976, the officers conducted periodic surveillance of Franklin with negative results except they observed defendant driving a 1972 black Thunderbird.
On September 10, 1976, at 3:30 p. m., the officers received information from a second informant, whose information in the past had led to arrests and convictions, that the defendant was presently in possession of a large quantity of heroin and was distributing *1317 it in large form. According to the second informant, Franklin sold one bundle of heroin for $175.00 to a third person when the informant was present.[1]
The officers proceeded to Apartment 112 and began surveillance of the apartment and the 1972 black Thunderbird. At 7:15 p. m., defendant left the apartment in his automobile and the officers, assisted by other police personnel, followed and watched the defendant. At one point when defendant stopped for a traffic light, a male pedestrian stepped up to the vehicle from the neutral ground, and Franklin handed him a brown paper bag. At another site within the city, the defendant got out of his vehicle and handed a brown paper bag to another man while entering a business establishment. The officers followed Franklin back to Apartment 112, arriving at approximately 8:30 p. m., and continued surveillance of the apartment and the Thunderbird automobile. At 9:35 p. m. a man and a woman arrived in separate automobiles and entered Apartment 112. About five minutes later defendant left the apartment, walked to his Thunderbird, and opened the passenger side door. After bending down briefly in the glove compartment area, he stood up and started to close the door. According to the officers nearest the Thunderbird, one of whom was observing defendant with field glasses, Franklin looked in their direction, a shocked expression came over his face, and he slammed the car door as he turned and ran. At this time he was carrying an unidentified object in his hand. Other officers who were stationed near the front of the apartment identified themselves as police and advised Franklin to stop and that he was under arrest. He did not stop, and the officers gave chase. By the time the first policeman reached the apartment door, it had been closed, but the officer used force to gain entry. At this moment the officer saw Franklin coming out of a closet in the living room area with his hand in the pocket of a jacket. Upon seizure of the defendant and search of the pocket, the police found a plastic bag containing heroin and a large sum of money. Other officers proceeded to search the rest of the townhouse apartment, including a kitchenette fifteen to twenty feet from the closet, where they found cut-up tinfoil, a blender and materials commonly used for the dilution of heroin.
Defendant moved to suppress all of the evidence resulting from the arrest, search and seizures. The trial judge denied the motion to suppress and filed a per curiam stating that the defendant failed to meet his burden of proving grounds for suppression by a preponderance of the evidence.
Defense counsel astutely points out that the trial judge applied an incorrect standard in allocating the burden of proof in this case involving a warrantless search. Paragraph C of La.Code of Criminal Procedure article 703 provides:
"On the trial of a motion to suppress filed under the provisions of this article the burden of proof is on the defendant to prove the grounds of his motion, except that the state shall have the burden of proving that a purported written confession or written inculpatory statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
The Official Revision Comments to article 703 explain that "Paragraph C states the general rule as to burden of proof, and continues the specific exception of R.S. 15:451." That statute provides that before a confession can be introduced into evidence, the State must affirmatively show that it was made free and voluntary. The comment to article 703 then provides, "No attempt has been made to deal with other possible exceptions to the general rule of burden of proof." (emphasis added).
*1318 Defense counsel did not point out nor were we able to find any Louisiana cases in which the issue of who bears the burden of proof at a motion to suppress hearing involving a warrantless search was squarely presented before this Court. In State v. Welch, 256 La. 1, 235 So.2d 72 (1970), for example, this Court stated that the State had carried its burden of showing that consent to search was given freely and voluntarily. Again, in State v. Dupuy, 319 So.2d 299 (La.1975), we stated that "the State bore its burden of proving by clear and convincing evidence" that consent to a warrantless search was freely given. However, in State v. Wood, 262 La. 259, 263 So.2d 28 (1972) and State v. O'Conner, 320 So.2d 188 (La.1975), cases also dealing with warrantless searches, this Court indicated that the burden of proof upon the motion to suppress is on the defendant. Thus, while Welch and Dupuy, supra, implicitly recognized that in warrantless search cases the burden of proof shifts to the State to justify the search, the contrary pronouncements in Wood and O'Conner, supra, illustrate that the law in this area is unsettled and confused.
We are of the opinion that article 703 must be construed in light of pronouncements by the United States Supreme Court that in the case of a warrantless search, the burden of proof rests on the State to show that an exception to the requirement of a search warrant is applicable. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1945).
While the United States Supreme Court apparently has never been squarely confronted with the issue of which party has the burden of proof in suppression hearings,[2] the lower federal courts take the position that once the defendant shows that the search was conducted without a warrant the burden then shifts to the government to prove that the search fits within an exception to the search warrant requirement. The Fifth Circuit in United States v. DeLaFuente, 548 F.2d 528 (C.A.5 1977), succinctly stated:
"(b) Burdens of proof in suppression hearings. It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. E. g., Rogers v. United States, 330 F.2d 535 (5 Cir. 1964); Addison v. United States, 317 F.2d 808 (5 Cir. 1963); Wilson v. United States, 218 F.2d 754 (10 Cir. 1955); White v. United States, 194 F.2d 215 (5 Cir. 1952); Jarabo v. United States, 158 F.2d 509 (1 Cir. 1946). Concededly, in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant. For example, if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search. E. g., Manuel v. United States, 355 F.2d 344 (5 Cir. 1966). * * *"
See also, United States v. Lee, 541 F.2d 1145 (5th Cir. 1976); United States v. Moody, 311 F.Supp. 756 (S.Car.1970); United States v. Carignan, 286 F.Supp. 284 (Mass.1967); United States v. O'Brien, 265 F.Supp. 953 (Mass.1967).
In accordance with these views, we hold that once the defendant makes the initial showing at a motion to suppress hearing that a warrantless search occurred, the burden of proof shifts to the State to affirmatively *1319 show that the search is justified under one of the narrow exceptions to the rule requiring a search warrant. Cf. State v. Lain, 347 So.2d 167 (La.1977); State v. Manso, et al., 352 So.2d 1282 (La.1977), docket No. 61,136.
Police entry into a residence in "hot pursuit" is one of the exceptions to the warrant rule. United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). However, in order for this exemption to apply, the officers must have had probable cause to arrest a culprit before pursuing him. Therefore, the initial inquiry is whether the officers had probable cause to arrest Franklin before entering Apartment 112.
In State v. Thomas, 349 So.2d 270, 272 (La.1977), we set forth the applicable principles:
"A warrantless arrest, no less than an arrest pursuant to a validly issued warrant, must be based on probable cause. [citations omitted] Probable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. [citations omitted] While the officer need not have sufficient proof to convict, mere suspicion is not enough to justify an arrest. [citations omitted]
"LaFave, `Street Encounters' and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich.L.Rev. 40, 73-74 (1968) observes:
"`As to the probability required for an arrest, it may generally be stated that it must be more probable than not that the person has committed an offense, although this is less certain as to the probability that a particular person is the offender than to the probability that a crime has been committed by someone. In the latter situation, which assumes central importance when there is no doubt who the offender is if a crime has been committed, courts ordinarily require that criminal conduct be more probable than non-criminal activity. This approach is reflected in those decisions which say that there must be "more evidence for [the existence of criminal conduct] than against" or that the suspect's actions must be "inconsistent with any innocent pursuit," and also in the many cases where grounds for arrest have been found lacking because the conduct of the suspect was equivocal, that is, where the possibility of criminal conduct was no greater than the possibility of innocent behavior.'" (Footnotes omitted.)
Applying these principles to the evidence in this case, we conclude that probable cause to arrest the defendant existed at the time he ran from his automobile with the object in his hand upon seeing the officers watching him with binoculars. The fact that a person runs or flees does not in and of itself establish probable cause. See, State v. Herbert, 351 So.2d 434 (La.1977), No. 58,726. Flight does not always indicate guilt; it may result from fear and possibly other causes. Even where flight does reasonably appear designed to avoid apprehension, reasonable cause will not arise unless the flight, combined with other information upon which the officers are entitled to rely, would indicate to a reasonable mind that the combination of circumstances is inconsistent with any innocent pursuit. In the instant case, when the officers arrived at Apartment 112 for their final stakeout, they were in possession of the following information: Two informants had reported that the defendant was engaged in wholesale heroin distribution within the city of New Orleans. One of the informants had seen the defendant sell a $175 bundle of heroin to a third person at an undisclosed location. The defendant left one of the apartments which an informant had said he was using in heroin trafficking and entered an automobile very similar to the one described by the informant's information. Defendant then drove to two locations within the city, and at each one transferred a brown paper bag to another man in a manner consistent with heroin distribution, except that no money was seen to have *1320 changed hands. At the time defendant saw the officers observing him at his car parked near Apartment 112, they were seated 30 to 50 feet away, and one was watching with binoculars. The area was fairly well illuminated with street lamps and light from a laundry room. Under all of the circumstances, including but not limited to the defendant's behavior upon his discovery of the police surveillance, criminal conduct was more probable than non-criminal activity.
Thus, we find that the officers had probable cause to arrest the defendant and consequently were entitled to pursue him into the apartment to effect the arrest. Santana, supra; Warden, supra; State v. Roach, 338 So.2d 621 (La.1976); State v. Wyatt, 327 So.2d 401 (La.1976).
In arresting the defendant the police were entitled to search the arrestee's person and the area within his immediate control to prevent the defendant from gaining possession of a weapon or destroying evidence. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). When the police were making the arrest the defendant had his hand in the pocket of a coat in the closet. Thus, at that time, the plastic bag containing heroin and the large sum of money were within the immediate reach of the defendant. Under the narrow search allowed by Chimel, supra, these items were lawfully seized and properly admitted into evidence.
The defendant contends that some of the most damning evidence introduced at trial resulted from a search of the apartment's kitchen which exceeded the constitutional limits imposed by Chimel, supra. The State does not contend that it was necessary to search the kitchen in order to secure weapons or criminal evidence possibly within the reach of the defendant or other suspects. The man and the woman who had entered the apartment shortly before the arrest were seated in the living room when the first officer entered and had peaceably submitted to physical custody before the extended search of the apartment began. The State contends, however, that the items which were seized from the kitchen were in "plain view" of the officers making the arrests. Therefore, it is argued, the seizure was constitutionally permissible. In Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1964), the Supreme Court set forth the criteria necessary for the plain view doctrine to be operative.
"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the `plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.
"An example of the applicability of the `plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. [citations omitted] Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in `hot pursuit' of a fleeing suspect. [citations omitted] And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. [citations omitted] Finally, the `plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. [citations omitted]
"What the `plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine *1321 serves to supplement the prior justification whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the `plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." [citations omitted] Id. at 465-66, 91 S.Ct. at 2037-38.
See also, State v. Fearn, 345 So.2d 468 (La.1977).
We cannot determine from the present record whether these criteria were met in the instant case. The evidence is clear that the officers did search the entire apartment so that it may not be contended by the State that they were content to a reasonable search incident to a lawful arrest as defined by Chimel, supra:
"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The `adherence to judicial processes' mandated by the Fourth Amendment requires no less." 395 U.S. at 763, 89 S.Ct. at 2040.
The evidence is conflicting and confusing as to whether the kitchen was, in fact, a separate room, or merely a kitchenette, divided from a combined dining and living room area by a breakfast bar, such as is located in a typical modern efficiency apartment. The fact that the kitchen was 15 to 20 feet away from the living room closet and the fact that the items seized in the kitchen were on the "counter" suggests the latter possibility. However, on the record before us we find it is also possible that the kitchen was a separate room into which the officers had no reason to extend their search and which was not in their plain view. If the evidence is in equipoise, since the burden of proof is on the State, then the motion to suppress should have been granted as to the items in the kitchen.
However, we hesitate to declare such a state of equilibrium. Because we did not see or hear the witnesses testify, we are not in a position to assign equal or unequal weight to their testimony. The trial judge was in a better position to assess the credibility and reliability of the testimony, but his ruling is flawed by his erroneous assumption that the burden of proof was upon the defendant. Instead, he should have required the State to affirmatively show that the search of the kitchen was within the bounds provided by Chimel and Coolidge in order to justify the seizure of the blender and other items located therein. If he had applied this standard of proof to his assessment of the witnesses' testimony it is possible that he would have found that the seizure of the articles in the kitchen resulted from an unlawful search. We find, therefore, that this assignment may have merit.

ASSIGNMENT OF ERROR NO. 2
Trial counsel stipulated that one of the State's police officer witnesses "is an expert in the field of narcotics trafficking and can give his expert opinion thereof." However, an objection to the relevancy of the evidence sought was interposed when the State's attorney asked the witness to "tell the court and jury about heroin coming into the country." The objection was overruled, and the prosecutor amended his question by asking the witness to "tell us how narcotic traffic operates." In response, the officer testified:
"Heroin originates in one of three places in the world: one in Turkey where they have poppy fields where raw opium is made, the golden triangle, which is Thailand and the Burma poppy fields are there and Mexico, some of the raw poppy owned by golden triangle goes into Europe and from Turkey also, some of the *1322 raw opium from Mexico, they have poppy fields there, but there is a basic difference between heroin in Europe and Mexico, Europe refines to the fullest extent, its [sic] white in color. We find in Nexico [sic] in the last two stages it is deleted in a cleaning process and brownish in color, it is brought in the country in various ways, by boat or planes in sealed luggage, in Mexico in automobiles, hidden in engines or transmissions or the body and carried in. Once it is smuggled in the U.S. it goes to the highest eschelon of drug traffic normally at this point from Europe it goes to New York and from Mexico it goes to California and Los Angeles area, from there people from our cities go to California or New York, and purchase wholesale quantities of heroin, return it to New Orleans to be polished or cut and the uncut is diluted to a weaker form in order to be distributed out of the City of New Orleans."
The officer proceeded to testify that the heroin obtained from New York and California, which ranges from 15% to 70% pure, is usually diluted to approximately 3% before being sold on the street. He described the dilution process as follows:
"It is brought to New Orleans and taken to a cutting pad where they cut it and the uncut heroin strength percentage is placed in a blender and diluted with dormin, procaine, novacaine, something of this sort, or milk sugar is placed in the uncut heroin and brought to a lower percentage. The person cutting the heroin usually does not have a way of chemically analyzing the heroin so usually he has an addict with him who is known as a tester and he throughout the entire operation will test the heroin to see when it is the right strength, from there the heroin is taken from the blender and put in papers and at one time it was 100 mgs per paper. In the past six months it has gone down to½ of a mg, it is placed in tinfoil and is sold to the addict on the street for a price of $12.00 to the addict."
Defendant acknowledges that it is relevant to a charge of possession with intent to distribute heroin to demonstrate that "the form and quantity of heroin usually associated with wholesale and street level distribution of that substance" was present in this case. State v. Maris, 337 So.2d 1177, 1183 (La.1976); see, State v. House, 325 So.2d 222 (La.1975). However, the defendant contends that the international and national distribution scheme tied nowhere in the trial evidence to the appellant Franklin was not only irrelevant to the charge but overwhelmingly prejudicial.
La.R.S. 15:435 provides that evidence must be relevant to a material issue. Relevant evidence is defined in La.R.S. 15:441 as follows:
"Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent.
"Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, are admissible."
Even though evidence may be deemed relevant because it has probative value, counterbalancing factors may exist which lead a court to exclude this otherwise relevant evidence if the probative value is outweighed. Among the factors to be considered are: the danger that the evidence may unduly arouse the jury's emotions of prejudice, hostility or sympathy; the probability that the evidence may create a collateral issue which will unduly distract the jury from the main issue; delay in the trial; the danger of unfair surprise. McCormick on Evidence, § 185 at 435; Comment, Louisiana Evidence: Relevant and Material Aspects, 21 Loy.L.Rev. 476 (1975).
The defendant points out that in State v. Luneau, 323 So.2d 770 (La.1975), this Court dealt with a similar problem and found that a reference to the foreign source of marijuana was inadmissible evidence. However, the conviction in that case was upheld because the testimony was unresponsive and volunteered. Further, because the jury returned a verdict of simple possession, the error complained of did not result in sufficient prejudice to warrant reversal. In the present case, unlike in the Luneau case, it was necessary to refer to *1323 the foreign source of heroin to explain the relevant fact that the drug enters the country in a condensed form and must be diluted before it can be consumed safely by addicts. It was not necessary to refer to the ways in which heroin is illegally imported, and under different circumstances such testimony could have been so highly prejudicial as to require reversal of the conviction. In the instant case, however, a review of the entire record shows that the danger was slight that the jury could have drawn the prejudicial inference that Franklin himself had smuggled the heroin. This assignment is without merit.
Since we find no trial error except for the possible error on the motion to suppress, it is not necessary at this time to reverse the conviction and order a new trial, because the possibility of error might be eliminated upon another trial of the motion to suppress. State v. Simmons, 328 So.2d 149 (La.1976); see, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). We reserve to the trial judge the power to grant a new trial should he determine that the articles seized from the kitchen are inadmissible. If, on the other hand, the trial judge determines, after a hearing on the motion to suppress, that the evidence is admissible, the right to appeal from such ruling is reserved to the defendant. In the absence of such an appeal, the conviction and sentence will be affirmed.
The case is remanded to the district court for further proceedings in accordance with this opinion.
SUMMERS, J., dissents.
NOTES
[1] One of the officers, in answer to a complex question, indicated that the informant said that he, the informant, had purchased the heroin from defendant at Apartment 112. But the other officer testified that the informant had merely witnessed the transaction between defendant and a third person, and the second officer's testimony did not specify whether the informant identified the site of the transaction. For purposes of our review we adopt the view more favorable to the defendant.
[2] In Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), a case concerned with an involuntary confession, the Court stated that the prosecution" must prove at least by a preponderance of the evidence that the confession was voluntary." Id. at 489, 92 S.Ct. at 627. In United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), which did not deal squarely with the issue of burden of proof at a suppression hearing involving a warrantless search, the Court did note "that the Government sustained its burden of proving by the preponderance of the evidence that Mrs. Graff's voluntary consent to search . . . ." Id. at 177, 94 S.Ct. at 996. See, LaFave, Search and Seizure: "The Course of True Law * * * Has Not * * * Run Smooth," 1966 U.Ill. L.F. 255, 347.