# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1998-CA-01520-COA

**HAROLD SPEED**                                                                   **APPELLANT**

**v.**

**ROBERT E. SCOTT**                                                                 **APPELLEE**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | SEPTEMBER 11, 1998 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WALTER W. DUKES |
| ATTORNEY FOR APPELLEE: | T. MACK BRABHAM |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| TRIAL COURT DISPOSITION: | JUDGMENT FOR PLAINTIFF, $50,000 DAMAGES AWARDED |
| APPELLATE DISPOSITION: | REVERSED AND RENDERED - 04/25/00 |
| MOTION FOR REHEARING FILED: | 5/1/2000; denied 7/25/2000 |
| CERTIORARI FILED: | 7/31/2000; granted 10/26/2000 |
| MANDATE ISSUED: | |

EN BANC

SOUTHWICK, P.J., FOR THE COURT:

¶1. The plaintiff Robert E. Scott was called a "liar and thief" by the defendant Harold Speed. The assertions occurred over a thirty-day period at four meetings of the volunteer fireman department in which both men served. Scott brought suit, though he took the position throughout that no one believed Speed and that Scott's reputation was undamaged. A jury awarded $50,000 in actual and punitive damages. We agree with Speed's argument that the absence of evidence of damage to reputation is fatal to Scott's suit. We reverse and enter judgment for the defendant.

## FACTS

¶2. Harold Speed has served as chief of the Smyrna Volunteer Fire Department since it was formed in 1989. Robert Scott moved to Copiah County in 1992 and built a home about four miles from the Smyrna fire station. The two men became friends at that time. Chief Speed invited the newcomer to become a volunteer with the fire department and Scott did so.

¶3. One dispute that arose between the two men in 1997 centered on the fire department's share of insurance rebate money. Apparently this is the money paid to the State Tax Commission annually as a tax

on insurance premiums, by them distributed to counties, and then allocated by boards of supervisors. Miss. Code Ann. §§ 83-1-37 & -39 (Rev. 1999). Chief Speed, Scott, and other Smyrna firemen believed that more of the money should be made available by the county for the volunteer fire departments. In March 1997 Smyrna firemen voted to seek publication of a letter on the subject in the county newspaper. Scott prepared it.

¶4. The defendant Speed at some stage became less enamored with that idea, testifying at trial that he feared that publishing the letter would harm the fire department's relations with the board of supervisors. At a meeting on May 18, Chief Speed and Scott informed the other firemen about a conversation that they both had with the president of the board of supervisors. Speed said that the president had warned them that the fire department should not be overly combative about the money. Scott on the other hand stated that the president told them to do whatever they thought was necessary. At that meeting, Chief Speed said that Scott was lying about what they had been told. A vote was taken, by which it was decided not to authorize publication. Some members objected to the propriety of the vote and abstained. Scott also argues that the vote was invalid, though whether fire department procedural rules were bent or broken has no importance to our issues.

¶5. In the local May 21 newspaper, the letter was published as an article by Scott. It stated that the Smyrna fire department had voted in favor of the distribution of funds that was suggested in Scott's article. Speed testified that he asked Scott why it was published despite the May 18 vote and was told that it was too late after the vote to withdraw it. Speed did not believe the assertion as he said that someone else had assured him that it was not too late to halt publication. At two meetings in June, Speed said to other firemen that Scott was lying about the publication issue.

¶6. While animosity was growing over the letter, Chief Speed and Scott became antagonists over a different matter. Chief Speed had earlier placed Scott in charge of an important training program that could favorably affect the department's evaluation by the State Fire Rating Board. Since the department served rural areas, connecting a hose to a fire hydrant was often impossible. The program on which Scott worked was to assure delivery of water from such sources as natural reservoirs. Information needed to be acquired on the location of these water sources. An exhibit was introduced at trial that apparently was the principal document in question. It was a two-page hand-written list containing notations made by Scott when he, Chief Speed, and another man took measurements one day in the field on the distances from ponds or other reservoirs to the closest location where the tanker could be maneuvered during a fire at any one of about thirty sites. The measurements were of distances of 50 feet to 300 feet to a reservoir.

¶7. Scott also prepared a loose-leaf booklet or binder that would contain this information. There is no evidence that the booklet contained anything beyond the list of locations of reservoirs and measurements. The description of the booklets in the minutes of a fire department meeting said that they contain "the addresses of all locations and the field site to be used by each location. [Scott] will make a book listing each field site and the length of blue line needed at each site." That is exactly the information that is on the two-page hand-written list of measurements. Scott agreed with the minutes other than that he only prepared one booklet, not one for each vehicle. He apparently placed clear plastic sheets into one binder and slipped the two pages with measurements between the sheets.

¶8. Scott testified that Chief Speed at the meetings of firemen that were held on May 29, June 3 and June 17, called him a "thief" for keeping these materials and not giving them to the fire department. Speed did not

remember using the word "thief," but said that he told the others that Scott had taken papers that did not belong to him. He said that Scott told him that "you're going to have to do it all over again. I'm going to take it with me." Speed acknowledges at least using the word "thief" when speaking privately to a couple who had attended one of the meetings.

¶9. The plaintiff Scott summarized the evidence that he presented this way:

> 1) May 18, 1997, Speed suggested Scott was lying at a meeting of firemen.
>
> 2) May 29, 1997, Speed called Scott a "thief" at a meeting.
>
> 3) June 3, 1997, Speed called a "liar and thief" at a meeting.
>
> 4) June 17, 1997, Speed repeated the phrase at a firemen's meeting.
>
> 5) June 17, 1997, Speed used the "liar and thief" phrase at the house of a married couple who had attended the fire department meeting earlier that day.

¶10. On June 26, 1997, Scott brought suit for slander and also for intentional infliction of emotional distress. He labeled the latter as "outrageous conduct" but acknowledges it is the same tort.[1] He sought actual and punitive damages. At trial Scott testified that the time between the incidents and the trial were "the worst fourteen months of my life." He says the allegation of lying and stealing the papers had "bothered him enormously," that he was shocked, mad, and felt insulted. He then talked about the value that he put on his reputation. He testified, "I don't sleep, I can't get it off my mind." He testified about no other damages. Scott also felt confident that no one believed that he was a liar or a thief, saying, "I don't know one" person who believed what Speed had stated.

¶11. Scott's wife also testified. She stated that Scott was not the same person. He had lost his sense of humor, was not as supportive of her emotionally, and was often up at night because he could not sleep. She used the phrase "I know I don't have my husband anymore. The man that I had a year and a half ago I don't have. . . ."

¶12. No evidence was offered indicating harm to Scott's reputation, effect on his livelihood, or any other monetary damage from the statements.

¶13. After deliberations, the jury returned a verdict that awarded $40,000 in compensatory damages and $10,000 in punitive. Judgment for those amounts was then entered.

## DISCUSSION

¶14. Speed raises three issues. The first concerns the fact that Scott's attorney at trial asked Speed two allegedly inflammatory questions, persisting in the inquiry even after an objection to the first question was sustained. We find no reversible error in that. Because of our ruling on the two issues relating to the evidence in this case, we only identify this first issue and then proceed beyond it. The remaining two issues we consider together.

### *Issue I: Evidence to support $40,000 in actual damages and $10,000 in punitive damages*

¶15. The parties agree on appeal that Scott's cause of action is either for intentional infliction of emotional

distress or for defamation. Speed argues that no award of actual or at least punitive damages could be made under either theory.

¶16. The tort of intentional infliction of emotional distress can be dispensed with rather quickly as an arguable basis in this suit. To justify a finding that this tort has occurred, the defendant's conduct must be "wanton and wilful and it would evoke outrage or revulsion." *Leaf River Forest Products, Inc. v. Ferguson,* 662 So. 2d 648, 659 (Miss. 1995). Among the kind of actions that have been found to evoke such outrage were a plot by a girlfriend and her parents to hide the child of an unwed father, arranging for the baby to be adopted by strangers while the father pursued a custody suit. *Smith v. Malouf*, 722 So. 2d 490, 498 (Miss. 1998). In another suit a car dealership forged a customer's name on a sales contract and sold the contract to a finance company, resulting in the customer's credit being damaged. *T. G. Blackwell Chevrolet v. Eshee*, 261 So. 2d 481, 486 (Miss. 1972).

¶17. Contrarily, what is not sufficient have been such actions as a law firm breaching an employment contract with an attorney, locking him out, refusing him secretarial support and dropping his name from the firm sign. *Fuselier, Ott & McKee PA v. Moeller*, 507 So. 2d 63, 69 (Miss. 1987). A Mississippi federal court defined the necessary severity as acts "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Pegues v. Emerson Elec. Co*., 913 F.Supp. 976, 982 (N.D. Miss.1996) (quoting Restatement (Second) of Torts § 46 cmt. d. (1965)). Such acts did not occur here.

¶18. As one court summarized the jurisprudence in this area, "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Jenkins v. City of Grenada,* 813 F. Supp. 443, 446 (N.D. Miss. 1993).

¶19. Some of Scott's witnesses testified that Chief Speed saw Scott as a potential rival and may have been trying to undermine him. That possible ulterior motive plus strong feelings and perhaps hot temper propelled Speed into his charges over the thirty-day period. We cannot find in these actions such conduct as would cause an observer of ordinary sensibilities to suffer "outrage or revulsion." Such emotions are not the initial or early severity of displeasure that we may have in the actions of our fellow citizens, but are perhaps the most extreme. Speed's conduct was over a fairly short period of time, arose from the disagreements between the two men and perhaps fears about Speed's career longevity. The plaintiff's own proof indicates that the assertions were not considered credible. The alleged lying concerned what a newspaper publisher may have said about the ability to stop publication, or a president of the board of supervisors may have said about the right course for the fire department to take. The thievery alleged was of some hand-written papers prepared for a training program. Speed's conduct simply cannot be seen as intolerable, outrageous or revolting.

¶20. This leaves the general tort of defamation. Defamation is "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." Prosser & Keeton on the Law of Torts §111 (5th ed. 1984) at 771. The usual analytical division is into the twin torts of libel for written defamations and slander for oral ones. *Id*. This was slander. What is needed in Mississippi to prove the tort are the following:

    (a) a false statement that has the capacity to injure the plaintiff's reputation;

(b) an unprivileged publication, i.e., communication to a third party;

(c) negligence or greater fault on part of publisher; and

(d) "either actionability of statement irrespective of special harm or existence of special harm caused by publication."

*Franklin v. Thompson,* 722 So. 2d 688, 692 (Miss. 1998). The meaning of "special harm" in the last element will be discussed presently.

¶21. By the time of trial Chief Speed stipulated that Scott was neither a liar nor a thief, but Speed did not concede that he knew the statements to be false when made in May and June 1997. The lower court found that Scott was a vortex public figure. A vortex public figure is a person "who is otherwise a private citizen but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest." *Eason v. Federal Broadcasting Co. d/b/a WDAM- TV,* 697 So. 2d 435, 438 (Miss. 1997) (quoting *Ferguson v. Watkins,* 448 So. 2d 271, 277 (Miss. 1984)). This is standard First Amendment law and therefore a required consideration. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351 (1974). On appeal neither party challenges the vortex figure designation.

¶22. If a person is deemed a vortex public figure and the alleged defamation concerns a matter of public interest, the plaintiff must prove that the defendant acted with actual malice. *Ferguson,* 448 So. 2d at 278. By "actual malice," it is meant that Chief Speed must have made the comments either knowing them to be false or in reckless disregard of their truth. *Franklin*, 722 So. 2d at 692.

¶23. The plaintiff Scott was resolute that no harm to his reputation occurred. No evidence of damage to reputation was offered. His attorney informed the court that no instructions on damage to reputation were offered. Sleeplessness, anger, and profound irritation about the statements were shown. Therefore, even though it is uncontested that the statements were "published" to third parties and even if there were jury issues on the knowing falsity and defamatory capacity of the statements, that leaves the issue of whether adequate proof of damage was introduced. As the supreme court observed, "no person avoids a few linguistic slings and arrows, many demonstrably unfair. . . . Still our sensitivity to the destructive power of words hardly suggests that we assess damages for all bruised feelings." *Ferguson*, 448 So. 2d at 276.

¶24. Slander requires proof of "special harm" unless the statements were actionable *per se. E.g., Franklin,* 722 So. 2d at 692. Discussed below are slanders that are actionable *per se* and need no special harm. However, when special harm must be shown, this is required:

All other slanderous words, no matter how grossly defamatory or insulting they may be, . . . are actionable only upon proof of "special" damages -- special in the sense that it must be supported by specific proof, as distinct from the damage assumed to follow in the case of libel or of the kinds of slander [that are actionable *per se*].

Prosser, Torts, § 112 at 793. "Special harm . . is the loss of something having economic or pecuniary value. . . . The limitation [that arose centuries ago] has persisted in the requirement that special harm, to serve as the foundation of an action for slander that is not actionable *per se*, must be 'temporal, 'material,' pecuniary or economic in character." Restatement of Torts (Second) § 575, cmt b. However, once it is shown that special harm resulted from a slander that was not actionable *per se*, recovery may then also be had for emotional distress and resulting bodily harm. *Id.* § 575 cmt. c.; *see also id*. § 623, cmt a. ("neither

emotional distress nor bodily harm resulting from it is special harm sufficient to support an action for a slander that is not actionable *per se*.")

¶25. These rules may at first blush seem artificial, but their purpose is obvious enough. Slander is an unusual tort, where mere spoken words become actionable. Everyday life contains risks of sharp words and wounded feelings, but also worse. Brought forward from common law origins is a balancing of the competing interests of one person to speak and another to be free from harm. Part of the balance struck is to require concrete harm before spoken words are actionable. The plaintiff Scott's concession that he had no pecuniary damages but was only seeking loss for mental distress means that no special harm was even alleged, much less proven.

¶26. What is left for Scott was to prove that these words fit within one of the five categories of slander identified in Mississippi for which no special harm need be shown:

> "(1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment. (2) Words imputing the existence of some contagious disease. (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof. (4) Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business;" and in this and some other jurisdictions [5] words imputing to a female a want of chastity.

*W. T. Farley, Inc. v. Bufkin,* 159 Miss. 350, 132 So. 86, 87 (1931).[2] Only the third somewhat problematic category of *Farley* does not appear in a similar listing in the *Restatement*. Restatement of Torts (Second) § 570. The chastity category was adopted by the supreme court only two years prior to *Farley*, after the court admitted that falsely claiming that a woman was unchaste was not actionable at common law without proof of special damages. *Interstate Co. v. Garnett,* 154 Miss. 325, 342-47, 122 So. 373, 376-78 (1929). The addition was made because these rules must be "adapted to our institutions and circumstances. . . ." *Id.* at 347, 122 So. at 378.

¶27. The only category that Scott argued was applicable was the one for allegation of a crime. When Chief Speed accused him of being a "thief" for taking papers regarding the firemen's training program, Scott says that this implied that he committed a criminal act.

¶28. The law is settled that the mere use of the label "thief" is insufficient. It is at this point that the majority and the dissent in the present case diverge. We note that the pre-eminent torts authority limits the actionable *per se* doctrine by concluding "that it is not always the crime, but rather the character of the act charged, which will be determinative. It is not every trivial assault or battery which involves 'moral turpitude,' but an accusation that the plaintiff beat his mother necessarily does." Prosser & Keeton, Torts, § 112 at 789. Similarly, every accusation of "theft" does not rise to the required level. One of the earliest Mississippi authorities that discussed these issues held that accusing someone of theft, when the act could not be "a felonious stealing," is not actionable *per se*. *Cock v. Weatherby*, 13 Miss. (5 S. & M.) 333, 337 (1845). The *Farley* court recognized exactly that by defining the first category of actionable *per se* slanders as only those charging a "criminal offense involving moral turpitude and infamous punishment."

¶29. No matter the criminal label, the charge must be a significant one:

> One who publishes a slander that imputes to another conduct constituting a criminal offense is subject

to liability to the other without proof of special harm if the offense imputed is of a type which, if committed in the place of publication, would be

(a) punishable by imprisonment in a state or federal institution, or

(b) regarded by public opinion as involving moral turpitude.

Restatement of Torts (Second) § 571.

¶30. In other words, the mere possibility that an act could be penalized under a criminal code is not enough. Falsely accusing someone of exceeding a highway speed limit is an example of an accusation of a crime that is not actionable *per se.* Only when the crime falsely imputed is of "major and serious a character . . . is [it] actionable without proof of special damage." *Id.* at cmt f. "This is not true of crimes punishable by imprisonment in the county jail or in a workhouse or other similar institution. Many petty misdemeanors, not regarded in the eyes of the community as highly disgraceful, are made punishable by imprisonment . . . . Unless these crimes are regarded, under Clause [§571](b), as involving moral turpitude, the accusation of their commission is not actionable *per se.*"*Id.* "Moral turpitude has been defined as inherent baseness or vileness of principle in the human heart. It means, in general, shameful wickedness, so extreme a departure from ordinary standards of honesty, good morals, justice or ethics as to be shocking to the moral sense of the community." *Id.* cmt. g. Claiming that this volunteer fireman took two notebook pad pages that he himself had written upon simply does not rise to a crime of shameful wickedness and extreme departure from community standards.

¶31. These considerations are recognized in Mississippi slander law. Prior to *Farley*'s designation of five categories of actionable *per se* slanders, Chief Justice Sydney Smith had discussed one of them in an appeal of damages awarded for a false charge that another person had taken property. The defendant's accusation was that after another person's death, the accuser "did not find in the [deceased's] house everything that was inventoried, and that Mrs. Pizatti, meaning the plaintiff, had taken property that did not belong to her out of the house," all of which implied that Pizatti was a thief. *Woodville v. Pizatti,* 119 Miss. 85, 80 So. 491 (1919). One person who heard the statement specifically recalled that the defendant had said that Pizatti "had taken part [of the property] away" that should have been in the house. *Id*., 80 So. at 492.

¶32. The plaintiff Pizatti argued that these words were "actionable *per se* under the common law, for the reason that they charge her with the commission of a crime." *Id.* The court agreed that allegations of a crime are actionable *per se*, "but only such as charge him with the commission of an act which, if true, would subject him to punishment-- 'for a crime involving moral turpitude, or would make him liable to a punishment infamous in character, or to one which, if not necessarily infamous, would bring disgrace upon him.' 17 R. C. L. 265." *Id.*

¶33. Even if a crime had been alleged, which the court doubted, it was not a crime of moral turpitude or one involving punishment infamous or disgraceful in character. Therefore, a peremptory instruction for the defendant should have been given. *Id.*

¶34. Though larceny can be a serious charge, we find that the allegation made by Chief Speed was not of that level of theft. Scott's possible taking of two hand-written pages of notebook paper was not an offense of moral turpitude, or a crime leading to punishment infamous or disgraceful. Though the firemen who heard

the statements may not have thought in terms of misdemeanor and felony, county jail or state prison, or even that the unauthorized taking of these pages may not have been a crime at all, it is obvious that the alleged theft was of documents of no intrinsic monetary value. There was nothing arduous about the means of reacquiring the information. Remeasurements would have inconvenienced the volunteer fire department. However, there was no possibility shown by these words that the plaintiff Scott would have suffered meaningful criminal liability from the theft.

¶35. Finally, to the extent Scott's lying about what he had been told by others needs to be analyzed under these rules, it is enough to say that even if Scott lied to the assembled firemen at a meeting, not in a court setting or otherwise under oath, that would not be a crime.

¶36. One relatively recent supreme court had discussed this issue. Immediately prior to citing *Pizatti* for a different principle, the supreme court stated that "an utterance falsely imputing a crime or accusing one of being a thief is actionable *per se." Baugh v. Baugh,* 512 So.2d 1283, 1285 (Miss. 1987). The dissent makes *Baugh* a rejection of the fundamental principles that we have discussed from earlier Mississippi precedents and the Restatement. The dissent argues that no matter the context, the mere use of the word "thief" is fatal. First, we note that this language from *Baugh* is actually more sweeping than even the dissent indicates. The relevant phrase is that "an utterance falsely [1] imputing a crime or [2] accusing one of being a thief is actionable *per se." Baugh,* 512 So.2d at 1285 (brackets added). *Baugh* literally provides that the imputation of any crime at all is actionable *per se*, which the dissent apparently accepts is not the law.

¶37. Secondly, even though the court did not discuss the standard limitations on these rules, the distinctions were irrelevant to the case. In fact, even without the distinctions the court found that an allegation that could have been interpreted to mean that the plaintiff had engaged in fraud to obtain Social Security benefits was not "a clear and unmistakable accusation" that a crime had occurred. *Id.* Thus *Baugh* understandably did not delve into the intricacies of what was not relevant to its decision. Important to our view is that *Baugh* cited and in no way criticized *Pizatti*, the case that made these distinctions clear. We find that neither part of the quoted sentence from *Baugh* should be read outside of the long-standing elaborations on the doctrine.

¶38. We also note that the dissent cites cases in which the word "thief" was used and found to be actionable *per se*, but these were for significant criminal acts. *E.g., Valley Dry Goods v. Buford,* 114 Miss. 414, 427, 75 So. 252, 254 (1917) (accused of stealing $100 from cash register where worked, in conspiracy with someone else); *Boler v. Mosby,* 352 So.2d 1320, 1323 (Miss. 1977) (customer alleged that he was falsely accused of shoplifting meat from the defendants' store had a claim that was actionable *per se*). We do not analyze the decisions from foreign jurisdictions that are cited, other than to note that the general national rule is well captured in the Restatement. As already indicated, that summary of the law provides that proof of damages is unnecessary only if the crime charged is sufficiently serious as to be punishable by imprisonment or is a crime that would be regarded by the public as involving moral turpitude. Restatement (Second) Torts, § 571.

¶39. The dissent's view destroys these traditional limitations. It is not the label used but the seriousness of the allegation that is important. Otherwise accusing someone of "theft" of a pencil, or a newspaper, or anything with an identifiable value no matter how minimal would be actionable *per se*. It is not uttering "thief" that presumptively steals the accused's good name, but only accusing someone of such a theft as would be a grave offense. The accusation of theft of the two sheets of paper is not in that category.

¶40. We return to one final authority for perspective. Since "it is not always the crime, but rather the character of the act charged, which will be determinative," this should be a court's focus:

> The idea toward which the courts obviously have been struggling is that imputation [of crime] is to be actionable without proof of damages only if it involves a major social disgrace, which might very well be the ultimate test.

Prosser & Keeton, Torts, § 112 at 789. This theft does not involve social disgrace.

¶41. We accept that the jury had discretion to determine that these statements were knowingly false and that Scott suffered anguish. We also find that Scott's concession that the only damage was non-monetary meant that no special harm had occurred. Further, Chief Speed's assertions that Scott lied to the firemen and that he was a thief for taking papers on a training program project for which he had been placed in charge, did not allege crimes involving moral turpitude or the prospect of infamous or disgraceful punishment.

¶42. We do not dismiss the statements as a frivolous matter. For purposes of the trial they were conceded to be false. Yet neither can we ignore that Scott failed in the proof necessary to obtain damages for Speed's actions. The trial court should have granted Speed's request for a peremptory instruction or later for a judgment notwithstanding the verdict. We enter judgment here for Speed.

¶43. **THE JUDGMENT OF THE COPIAH COUNTY CIRCUIT COURT IS REVERSED AND JUDGMENT IS RENDERED FOR THE APPELLANT. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

> **MCMILLIN, C.J., LEE AND MOORE, JJ., CONCUR. KING, P.J., CONCURS IN RESULT ONLY.**

> **BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, PAYNE, AND THOMAS, JJ.**

> BRIDGES, J., DISSENTING:

¶44. Because the majority finds that the "law is settled that the mere use of the label 'thief' is insufficient" to be actionable *per se*, I respectfully dissent. I come to quite a contrary conclusion and believe that the law is settled that when one uses word "thief," a cause of action for slander *per se* has been met.

¶45. I agree with the majority's analysis of the law, up until its discussion of what statements are actionable *per se*. The majority cites *Baugh v. Baugh*, 512 So. 2d 1283, 1285 (Miss. 1987). One of the issues before the *Baugh* Court was whether the statements made by the defendant were a clear and unmistakable accusation that the plaintiff was guilty of fraud. *Id.* at 1284-85. The Court found that the statement uttered by the defendant "could as easily be construed as an expression of surprise . . . ." *Id.* at 1285.

¶46. The *Baugh* Court in discussing slander *per se* stated that "[w]ithout doubt, an utterance falsely imputing a crime or accusing one of being a thief is actionable per se." *Id.* (citing *Boeler v. Mosby*, 352 So. 2d 1320, 1323 (Miss. 1977); *Lemonis v. Hogue*, 213 Miss. 775, 780, 57 So. 2d 865, 866 (1952)). "The slander, however, must be clear and unmistakable from the words themselves and not be the product of *innuendo, speculation or conjecture*." *Id.* (emphasis added). The issue was whether the statement by the

defendant was an unmistakable accusation that the plaintiff committed a crime, not whether the expression "thief" was a term sufficient to meet the criteria for slander *per se*.

¶47. In this case, there is no doubt that Scott called Speed a thief, possibly as many times as four. There is no innuendo, speculation, or conjecture here.

¶48. The majority also cites as authority the case of *Woodville v. Pizatti*, 119 Miss. 85, 80 So. 491 (1919). In *Woodville*, there was a controversy over furniture and certain items taken from a home. *Id.* Pizatti testified that Woodville said, "What have in the house [sic], took it out without inventory; . . . what they had in the house, didn't have it inventoried. . . . You must have took it out." *Id.* at 492. Woodville denied that she said this, but rather said, "I was responsible for every thing that was inventoried." *Id.* The Court found that the statements made by Woodville, "certainly do not charge the commission of a crime . . . since the plaintiff claimed at least a part of the furniture . . . they do not necessarily imply that the taking by the plaintiff of a part of the 'stuff' out of the house *was with any criminal intent whatever*." *Id.* (emphasis added). So the issue before the Court was whether the alleged slanderous statements implied that Pizatti committed a crime.

¶49. Again, that is not the case here. Speed called Scott a thief, inferring a criminal offense.

¶50. In 1917, the Mississippi Supreme Court determined that "accusing a person of being a thief is actionable per se." *Valley Dry Goods Co. v. Buford*, 114 Miss. 414, 427, 75 So. 252, 254 (1917). The Mississippi Supreme Court again affirmed this decision that "thief" is slander *per se* in *Boler v. Mosby*, 353 So. 2d 1320, 1323 (Miss. 1977). "With reference to the common law action for slander we have held that it is sufficient to charge the words which constitute the slander by using the exact words or by using synonymous words, and that accusing a person of being a thief is actionable per se." *Id.* (citing *Valley Dry Goods Co.*, 114 Miss. at 427, 75 So. at 254).

¶51. Other jurisdictions which have discussed the exact term "thief" found this assertion is slander *per se*. "Falsely calling someone a . . . 'thief' . . . falls within the parameters of slander per se . . . ." *Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197, 200 (Tex. Ct. App. 1996). *See also K-Mart Corp. v. Washington*, 866 P.2d 274, 283 (Nev. 1993); *Barlow v. International Harvester Co.*, 522 P.2d 1102, 1112 (Idaho 1974); *Hayes v. Smith*, 832 P.2d 1022, 1025 (Colo. Ct. App. 1991); *Mains v. K-Mart Corp.*, 375 S.E.2d 311, 314 (S.C. Ct. App. 1988); *Agnew v. Hiatt*, 466 N.E.2d 781, 783 (Ind. Ct. App. 1984); *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. Dist. Ct. App. 1977).

¶52. I would affirm the jury's decision that Speed defamed Scott.

**IRVING, PAYNE, AND THOMAS, JJ., JOIN THIS SEPARATE OPINION.**

1. Restatement of Torts (Second) § 46 uses the heading "outrageous conduct" for the tort that it then describes with the elements for intentional infliction of emotional distress.

2. The court did not cite its source for the quotation. We found no Mississippi court opinion from which this quote was obtained. The quote is similar but not identical to language in a source cited in the reported summary of briefs. 159 Miss. at 351, citing 25 Cyc. Law & Proc., *Libel & Slander* (1907) at 264-65. The quote is not from the appellant's brief; the appellee's brief is not with the

archived file in this or in a related case. Record Group 32, cause # 29,137, Miss. Dept. Archives & History; *Ray v. W. T. Farley, Inc.*, 131 So. 365 (Miss. 1930), cause # 29,033.